In the Matter of PATCHOGUE-MEDFORD CONGRESS OF TEACHERS, Respondent, v BOARD OF EDUCATION OF THE PATCHOGUE-MEDFORD UNION FREE SCHOOL DISTRICT et al., Appellants.

Second Department, August 11, 1986

## APPEARANCES OF COUNSEL

*Cooper, Englander & Sapir, P. C. (Robert E. Sapir* and *David M. Cohen* of counsel), for appellants.

*Kaplowitz, Galinson & Johnson (Daniel Galinson* of counsel), for respondent.

*Richard Emery* for New York Civil Liberties Union, *amicus curiae.*

*James R. Sandner (Janis Levart Barquist, John H. Jurgens* and *Katherine A. Levine* of counsel), for New York State United Teachers, *amicus curiae.*

### OPINION OF THE COURT

RUBIN, J.

The question presented is whether, absent a contract requirement, certain probationary teachers represented by the petitioner may be compelled, as a condition of receiving tenure, to submit themselves to investigatory urine tests to detect the use of controlled substances, even though there is no indication that any one of such teachers uses, or ever has used, illegal drugs. We conclude that such compulsory testing constitutes a search within the meaning of the US Constitution 4th Amendment, and that to compel a probationary teacher to undergo such a search without reasonable suspicion that such teacher is, or has ever been, a drug user, is unconstitutional. Accordingly, we affirm the order and judgment which prohibited such testing.

The facts of this case are largely undisputed. On or about May 3, 1985, the appellant Henry P. Read, the Superintendent of Schools of the appellant Patchogue-Medford Union Free School District, informed certain probationary teachers that they would be required to submit urine samples to school nurses, and that compliance with that directive would be a condition of his recommendation for appointment to tenure. The school nurses were instructed to notify those teachers to appear before them on May 13, 1985, in order for the urine samples to be collected. Prior to that time, the petitioner Patchogue-Medford Congress of Teachers, the recognized representative of these teachers, commenced this proceeding pursuant to CPLR article 78, for a judgment, *inter alia,* prohibiting the school district from directing probationary teachers eligible for tenure to submit to urine tests for the purpose of detecting the use of controlled substances.

In their answer to the petition, the appellants asserted, *inter alia,* that the subject urine tests were in conformity with article XIX (D) of the parties' collective bargaining agreement,

which requires that probationary teachers whose tenure appointment is impending must "fulfill the requirements for a medical examination and tuberculin test". However, the record establishes that the teachers concerned had already submitted to what had apparently been complete physical examinations before Mr. Read informed them that an additional test (the urine test) would be required. In light of this, Special Term properly found, as a matter of fact, that the proposed urine test "was not part of the medical examination of the prospective tenure teachers but was a new procedure not mentioned in the [collective bargaining agreement]". Accordingly, as conceded by the appellants at oral argument, the proposed test was clearly not a "medical examination" within the contemplation of article XIX (D) of the collective bargaining agreement, but was, rather, purely investigatory. Thus, the medical examination provision of the collective bargaining agreement cannot be cited as justification for the proposed urine test.

The question, then, becomes whether the appellants may, in the exercise of their legitimate oversight responsibilities, order the probationary teachers to undergo drug testing, even though such testing is not called for in the parties' collective bargaining agreement and there is no basis for believing that any one of these teachers has ever used or is using illegal drugs. The petitioner argues that such arbitrary testing is unconstitutional. In addressing this argument, we must determine, first of all, whether such testing amounts to a search or seizure within the meaning of the 4th Amendment.

US Constitution 4th Amendment provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated". The essential purpose of this provision is to safeguard the privacy of individuals against arbitrary invasions by agents of the State (*Delaware v Prouse*, 440 US 648, 653-654; *Marshall v Barlow's, Inc.*, 436 US 307, 312; *Camara v Municipal Ct.*, 387 US 523, 528). In *Schmerber v California* (384 US 757, 767) the Supreme Court stated that "[t]he overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State". The court in *Schmerber (supra)* held that arbitrary State-sponsored intrusions into the human body are equally as offensive to the 4th Amendment as unreasonable searches of a person's home or property. We now hold that the act of compelling a person to provide a urine sample

is a search within the meaning of the 4th Amendment, and we reject the argument that, since such testing involves no physical intrusion into the body, the 4th Amendment is not implicated. In so holding, we are in accord with a number of other courts which have passed on this issue (see, e.g., Division 241 Amalgamated Tr. Union [AFL-CIO] v Suscy, 538 F2d 1264, cert denied 429 US 1029; Storms v Coughlin, 600 F Supp 1214, 1218; Allen v City of Marietta, 601 F Supp 482, 488-489).

Having decided that the proposed urine test is a search, we must next address the question of whether such a search is, under the facts of this case, unreasonable. This question requires us to perform a sensitive balancing test, in which we must weigh the affront and the invasion of privacy inherent in such testing against the need for such testing, and the benefits that would result from it, i.e., the possible identification of probationary teachers who are unfit to teach. As stated by the Supreme Court in Bell v Wolfish (441 US 520, 559), "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted". Another critical determination is whether the probationary teachers retained a justifiable expectation of privacy upon entering the teaching profession (cf. Hudson v Palmer, 468 US 517, 525; Katz v United States, 389 US 347, 361 [concurring opn of Harlan, J.]).

In assessing the reasonableness of the teachers' expectation of privacy, we must contrast the nature of the teaching profession with other types of employment. We distinguish, at the outset, those businesses and industries which, because, inter alia, of the threat of criminal involvement, have historically been so pervasively regulated by the State that any person who enters into such a profession must be deemed to have consented to intense governmental scrutiny. In such pervasively regulated industries, any employee has a significantly diminished expectation of privacy, so that intrusive testing by a governmental agency may be permitted even in the absence of any articulable individualized suspicion (see, e.g., Shoemaker v Handel, 608 F Supp 1151). Clearly, the profession of teaching is not in the same category as liquor (Colonnade Corp. v United States, 397 US 72, 77), firearms

*(United States v Biswell,* 406 US 311, 316), casino gambling *(Matter of Martin,* 90 NJ 295, 447 A2d 1290), or horse racing *(Shoemaker v Handel, supra),* businesses which have traditionally been considered pervasively regulated. Since teaching is not such a pervasively regulated industry, the 4th Amendment requires, at a minimum, that there be some degree of suspicion before the dignity and privacy of a teacher may be compromised by forcing him or her to undergo a urine test.

While teachers do not surrender their 4th Amendment right to privacy merely because they go to work for a public school, on the other hand, a Board of Education has a legitimate interest in overseeing its employees and investigating potential misconduct relevant to the employee's performance of his or her duties *(cf. Allen v City of Marietta,* 601 F Supp 482, 491, *supra).* "No doubt most employers consider it undesirable for employees to use drugs, and would like to be able to identify any who use drugs. Taking and testing body fluid specimens * * * would help the employer discover drug use and other useful information about employees * * * That potential, however, does not make a governmental employer's search of an employee a constitutionally reasonable one" *(McDonell v Hunter,* 612 F Supp 1122, 1130).

We are cognizant of the fact that illegal drug usage can have an adverse impact upon a teacher's ability to safeguard and supervise pupils in his or her charge. However, the need of public employers to conduct urine tests to ascertain illegal drug usage in the teaching profession, important as it may be, is not as crucial as in other governmental positions, such as that of police officer, fire fighter, bus driver, or train engineer, where, given the nature of the work, the use of controlled substances would ordinarily pose situations fraught with imminent and grave consequences to public safety. Even with respect to such occupations, various courts have held that compulsory urine tests are constitutionally impermissible in the absence of an articulable basis for suspecting that the public employee is using illegal drugs *(see, City of Palm Bay v Bauman,* 475 So 2d 1322 [Fla] [urine testing of police officers and firemen]; *Turner v Fraternal Order of Police,* 500 A2d 1005 [DC App] [urine testing of police]; *Matter of Caruso v Ward,* Sup Ct, NY County, July 1, 1986, Parness, J.; *Division 241 Amalgamated Tr. Union [AFL-CIO] v Suscy, supra* [urine testing of bus and train operators of the Chicago Transit Authority]; *Matter of King v McMickens,* 120 AD2d 351 [urine testing of correction officers]; *Matter of Kralick v*

*Lowery,* 32 AD2d 317, *affd* 26 NY2d 723, *cert denied sub nom. Vyse v Lowery,* 397 US 1075 [blood testing of fire fighters]; *contra, Allen v City of Marietta, supra,* at pp 488- 489 [urine testing of public employees engaged in the extremely hazardous occupation of working around high voltage wires]). Certainly, the degree of suspicion should be no less when the employees called upon to submit to such testing are teachers.

We note, however, that we reject the argument that the type of test proposed in this case is warranted only upon a showing of full-scale probable cause. Probable cause is not required where the search is not aimed at the discovery of evidence for use in a criminal trial *(see, Camara v Municipal Ct.,* 387 US 523, *supra; Matter of King v McMickens, supra; Matter of Krolick v Lowery, supra).* Balancing a Board of Education's interest in ensuring that its employees are fit to perform their jobs against the teachers' reasonable expectation of privacy, we hold that the reasonable suspicion standard is the appropriate basis for constitutionally compelling a public school teacher to submit to a urine test for the purposes of detecting the use of controlled substances *(accord, Matter of King v McMickens, supra; Matter of Caruso v Ward, supra; City of Palm Bay v Bauman,* 475 So 2d 1322, 1325-1326, *supra* [and cases cited therein]; *Security & Law Enforcement Employees v Carey,* 737 F2d 187, 205).

In the case under review, the appellants have failed to show an objective, factual basis for inferring that any one of the subject teachers uses or has used illegal drugs. Strikingly absent from the record is even a scintilla of suspicion, much less reasonable suspicion. We conclude, based on the record before us, that the ordering of a urine test for drug abuse was an act of pure bureaucratic caprice. It follows ineluctably that the proposed investigatory urine tests are unconstitutional, and were properly prohibited.

The remaining arguments made by the parties and by the *amici curiae* have been reviewed. Such arguments are either without merit or, in light of the foregoing, academic. Accordingly, the order and judgment appealed from should be affirmed.

MOLLEN, P. J., WEINSTEIN and SPATT, JJ., concur.

Order and judgment (one paper) of the Supreme Court, Suffolk County, dated July 1, 1985, affirmed, without costs or disbursements.