216 N.J. Super. 461 (1987)
524 A.2d 430
THE FRATERNAL ORDER OF POLICE, NEWARK LODGE NO. 12, A NOT-FOR-PROFIT CORPORATION OF THE STATE OF NEW JERSEY, ON BEHALF OF ITS MEMBERS, ET AL., PLAINTIFFS-APPELLANTS,
v.
THE CITY OF NEWARK, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, ET AL., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued October 15, 1986.
Decided March 26, 1987.
*462 Before Judges PRESSLER, GAULKIN and ASHBEY.
Janemary S. Belsole argued the cause for appellants (Stern, Steiger, Croland, Tanenbaum & Schielke, attorneys; Janemary S. Belsole and Stuart Reiser, on the brief).
Kathleen C. Goger argued the cause for respondents (Furst & Waldman, attorneys).
Robert A. Goodsell argued the cause for amicus curiae American Civil Liberties Union of New Jersey (Irwin, Post & Rosen, P.A., attorneys).
The opinion of the court was delivered by GAULKIN, J.A.D.
Plaintiffs brought this action in lieu of prerogative writs to invalidate a directive issued by the City of Newark Police Director mandating that all members of the Narcotic Bureau be subjected to urine testing for drug abuse "both upon transfer [into the Bureau] and at least twice a year afterwards." The Law Division judge sustained the directive. Plaintiffs appeal.

*463 I.
Memorandum 85-259, issued by Police Director Knox on December 10, 1985, reads in its entirety as follows:
1. Narcotic enforcement is the most sensitive and health threatening assignment in policing today. It exposes the Police Officer to certain health hazards that are not necessarily encountered in normal patrol work. The advent of Acquired Immune Deficiency Syndrome, commonly referred to as AIDS, is a prime example of a real health threat.
2. Secondly, Narcotic enforcement is, by its very nature, a sensitive assignment, requiring the highest degree in confidence. Confidence is the key to narcotic investigations; it is not only the trust between the investigator and an informant, it is also faith in performance, ability and the manner in which laws are enforced. Police Officers should bear in mind that they symbolize the dignity and authority of the Law. It is a harsh reality that we, as Police Officers, must maintain standards of conduct that are above that which is expected of the average citizen in order that we maintain the confidence and trust of the public that we serve.
3. These dual concerns, the health of the employee and the trust of the public is of paramount concern to this Department.
4. Effective 0001 hours, December 12th, 1985, all members of the Narcotic Bureau shall be required to take a urinalysis and blood test. Furthermore, any transfer into the Unit shall be predicated upon a successful urinalysis and blood test. Any request of transfer to the Narcotic Bureau shall be forwarded with the understanding that a urinalysis exam and blood test is required as part of the assignment, both upon transfer and at least twice a year afterwards. These exams are to be administered to determine:
a. Health deficiencies
b. Substance abuse
5. Furthermore, all such testing shall be conducted under the supervision of the Police Surgeon or his representative and the Internal Affairs Bureau. All results are to be confidential and forwarded to the Police Director for review.[1]
The Memorandum was delivered to plaintiff Fraternal Order of Police (FOP) on December 12, 1985. Narcotic Bureau officers reporting for duty that afternoon were ordered to provide urine specimens. This action was filed on December 13, 1985. The City was immediately enjoined from any further implementation of the Memorandum; the injunction remained effective throughout the trial proceedings and has been continued pending disposition of this appeal.
*464 The genesis and intended operation of the Memorandum were described by Director Knox in an affidavit. Director Knox was "concerned ... with drug abuse among members of the Police Department" and also "with the public perception with respect to the drug abuse among members of the Police Department." His concern resulted from his "awareness of the extent and seriousness of the problem of drug abuse in society in general, and in Newark in particular, as well as the results of recent urine testing of Police Department recruits[.]" He asserted that the testing of two recent classes of recruits "yielded 5 positive tests for such substances as cocaine, heroin, morphine and barbituates." Director Knox continued that "[p]ublic confidence ... is crucial to effective law enforcement"; such confidence "depends on credibility and the urine testing contemplated by Memorandum 85-259 will go a long way toward reinforcing credibility." In addition, the tests were intended "to serve the interests of public safety and effective law enforcement by deterring drug use."
In a deposition, Director Knox also said that he had received "[s]pecific information from citizens in the community and also from street people" about police officers using controlled dangerous substances, including allegations against two Narcotic Bureau officers. He said he had received information from two commanding officers about the same Narcotic Bureau officers. However, Director Knox said the information received from the commanding officers did not play any role in his issuance of the directive: "I intended to test members of this police department anyway."
As to the intended operation of the tests, Director Knox set forth in his affidavit that the procedures to be used "are the same as those already utilized in testing recruits." Samples would be field-tested first "using the EMIT urine screening program." Those samples which test positive would be forwarded for laboratory testing. All test results would be "confidential," but police officers for whom positive samples are found "will be charged as set forth in the rules and regulations." *465 However, test results "will not be made known to the prosecutor and no criminal charges will be brought."
The issues were presented to the trial judge on the pleadings, affidavits and deposition testimony. In an unreported opinion, the judge concluded that mandatory urine monitoring constitutes a "search" within the meaning of the New Jersey and United States Constitutions but that "there are no constitutional inhibitions against the Director's basic power to issue Memorandum 85-259."[2] The judge ordered a hearing, however, "on whether the means of enforcing the Director's order are calculated to show accurately the presence of controlled dangerous substances in the urine, and also whether the tests will be conducted with a minimum possible invasion of the police officer's personalty and privacy."
On June 16, 1986, the trial judge entered final judgment ordering, among other things, that "the acquisition of urine and the testing of urine, if conducted, shall be conducted in accordance with the Methods and Procedures for Urine/Drug Screening" incorporated in the judgment. Those methods and procedures are set forth in Appendix A attached to this opinion. Plaintiffs appeal from that judgment.[3]

II.
Plaintiffs' principal contention here, as in the trial court, is that drug/urine testing as authorized by Memorandum 85-259 would constitute an unreasonable search and seizure in violation of Article I, ¶ 7 of the New Jersey Constitution and also of *466 the Fourth Amendment of the United States Constitution, both of which direct that
[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.
The City does not dispute plaintiffs' contention that a governmentally compelled taking of urine is both a "search" and a "seizure" within the meaning of the constitutional provisions. That proposition is uniformly recognized in the reported cases. See e.g. McDonell v. Hunter, 809 F.2d 1302 (8th Cir.1987); Shoemaker v. Handel, 795 F.2d 1136 (3d Cir.1986), cert. den. ___ U.S. ___, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986); Nat'l Treasury Employers Union v. Von Raab, 649 F. Supp. 380, 387 (E.D.La. 1986); Capua v. City of Plainfield, 643 F. Supp. 1507, 1513 (D.N.J. 1986); Allen v. City of Marietta, 601 F. Supp. 482, 488-489 (N.D.Ga. 1985); Storms v. Coughlin, 600 F. Supp. 1214, 1218 (S.D.N.Y. 1984); City of Palm Bay v. Bauman, 475 So.2d 1322, 1324 (Fla. Dist. Ct. App. 1985); Caruso v. Ward, 133 Misc.2d 544, 506 N.Y.S.2d 789, 792 (Sup.Ct. 1986). The parties thus properly frame the issue as being whether the search and seizure authorized by the Memorandum would be "unreasonable."[4]
We start with the principles that a search or seizure based upon a warrant supported by probable cause[5] is "presumed to be valid" (State v. Valencia, 93 N.J. 126, 133 (1983)), and that a warrantless search is "prima facie invalid unless it comes within one of the specific exceptions to the warrant requirement" of the constitutional provisions. State v. Young, 87 N.J. 132, 141 (1981). See Katz v. United States, 389 U.S. 347, 357, *467 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). We conclude that the searches and seizures contemplated by the Memorandum do not come within any "specific exception" to the warrant requirement.
Many of the exceptions to the warrant requirement nevertheless require a showing of probable cause. See, e.g., Valencia, 93 N.J. at 136 (warrantless search permissible upon showing of exigent circumstances and probable cause); State v. Martin, 87 N.J. at 567 (warrantless search of automobile permissible if based on probable cause); Young, 87 N.J. at 142, n. 4 (an arrest made upon probable cause allows a warrantless search of the arrestee's person and immediate vicinity). Other warrantless searches or seizures are lawful on a showing of some individualized suspicion less than probable cause. See, e.g., New Jersey v. T.L.O., 469 U.S. 325, 342, 105 S.Ct. 733, 744, 83 L.Ed.2d 720 (1985) (warrantless school search will ordinarily pass constitutional muster "when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school"); Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) (discretionary automobile stops require "reasonable suspicion"); United States v. Brignoni-Ponce, 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975) (roving-patrol automobile stops in border areas are permissible "when an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country...."); Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (warrantless "stop and frisk" sustainable upon a showing that "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger"); United States v. Bunkers, 521 F.2d 1217 (9th Cir.1975), cert. den. 423 U.S. 989, 96 S.Ct. 400, 46 L.Ed.2d 307 (1975) (warrantless search by postal inspector of employee's locker was justified by showing of reasonable suspicion of criminal activity); State v. Davis, 104 N.J. 490, 504 (1986) (investigatory stop by police only valid if officer has a *468 particularized suspicion); State v. Adams, 125 N.J. Super. 587, 598-600 (App.Div. 1973) (warrantless search at airport upheld where traveler fit skyjacker profile, set off magnometer and pat-down search uncovered suspicious bulge). None of those "specific exceptions" to the warrant requirement serves to validate the Memorandum, which concededly does not condition urine testing on either probable cause or any individualized suspicion.
The City seeks to bring the proposed testing within the "pervasively regulated industry" exception to the warrant requirement, which permits certain warrantless searches and seizures without either probable cause or individualized suspicion. Administrative searches, i.e., those conducted to enforce a regulatory scheme, are subject to the Fourth Amendment and commonly require the issuance of a warrant. See Marshall v. Barlow's, Inc., 436 U.S. 307, 323-324, 98 S.Ct. 1816, 1825-26, 56 L.Ed.2d 305 (1978); See v. City of Seattle, 387 U.S. 541, 545-546, 87 S.Ct. 1737, 1740, 18 L.Ed.2d 943 (1967); Camara v. Municipal Court, 387 U.S. 523, 534-535, 87 S.Ct. 1727, 1733-34, 18 L.Ed.2d 930 (1967). However, private commercial property utilized in a pervasively regulated industry may be inspected without a warrant and without individualized suspicion. See Donovan v. Dewey, 452 U.S. 594, 599-602, 101 S.Ct. 2534, 2538-39, 69 L.Ed.2d 262 (1981); United States v. Biswell, 406 U.S. 311, 315-317, 92 S.Ct. 1593, 1596-97, 32 L.Ed.2d 87 (1972); Colonnade Catering Corp. v. United States, 397 U.S. 72, 76-77, 90 S.Ct. 774, 776-77, 25 L.Ed.2d 60 (1970). Persons associated with such an industry may also be subjected to a warrantless search, at least while on the commercial premises. In re Martin, 90 N.J. 295, 313-314 (1982).
The City principally relies on Shoemaker, which upheld regulations of the New Jersey Racing Commission permitting alcohol and drug testing of jockeys and other licensed persons without probable cause or reasonable individualized suspicion. *469 795 F.2d at 1142. Noting that the licensees had always been aware that they were subject to "intense state regulation," the court found that the regulatory interest in protecting both the wagering public and the public justified the testing requirements. The court took pains to point out, however, that its holding applies only to testing of "voluntary participants in a highly-regulated industry." Id. at 1142 n. 5. See Rushton v. Nebraska Public Power District, 653 F. Supp. 1510 (D.Neb. 1987) (random drug screening of public utility employees upheld under the rationale of Shoemaker).
Police officers are not members of a "highly-regulated industry." Like many other groups of public employees, police officers are subject to a variety of statutory and administrative controls.[6] But government's supervision of its employees cannot be equated with the regulation of sensitive industries requiring "close supervision and inspection." See, e.g., In re Martin, 90 N.J. at 312-313. Police are not engaged in a "commercial enterprise" (cf. Donovan, 452 U.S. at 599, 101 S.Ct. at 2538); they are not subject to a "comprehensive and defined" regulatory scheme in which drug testing is a "necessary component" (Id. at 600, 101 S.Ct. at 2538); there has been no legislative determination "that warrantless searches are necessary to further a regulatory scheme[.]" (Ibid.). To treat the police as a "pervasively regulated industry" would dangerously extend and distort that exception to the warrant requirement beyond its intended scope. We thus find ourselves in agreement with the many courts which have found Shoemaker inapplicable to or distinguishable from cases involving public employees. See, e.g., American Fed. of Gov't. Employees, *470 AFL-CIO v. Weinberger, 651 F. Supp. 726, 734-35 (S.D.Ga. 1986); Caruso, 506 N.Y.S.2d at 798.[7]

III.
Since the contemplated warrantless drug testing does not fit within any "special exception" to the warrant requirement, we must regard the Memorandum as "prima facie invalid." Young, 87 N.J. at 141. Defendants accordingly "must prove the overall reasonableness and validity of the search" and seizures they propose. Valencia, 93 N.J. at 133.
Reasonableness is not easy to assess or describe. As Justice (now Chief Justice) Rehnquist said in Bell v. Wolfish, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979):
The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.
Specific applications of those general principles can be found in the decided cases. As to the "need for the particular search," the "substantiality of the public interest" in the challenged practice must be assessed. See Donovan, 452 U.S. at 602, 101 S.Ct. at 2539; United States v. Martinez-Fuerte, 428 U.S. 543, 556, 96 S.Ct. 3074, 3082, 49 L.Ed.2d 1116 (1976). A closely allied inquiry is whether the particular law enforcement technique at issue is needed. See Martinez-Fuerte, 428 U.S. at 562, 96 S.Ct. at 3085; State v. Kirk, 202 N.J. Super. 28, 55 (App.Div. 1985). The availability and practicality of alternative means of investigating the asserted evil is also of significance. See, e.g., Bell, 441 U.S. at 559, n. 40, 99 S.Ct. at 1885, n. 40; Martinez-Fuerte, 428 U.S. at 556 n. 12, 96 S.Ct. at 3082 n. 12.
Such public interest considerations must be weighed against a variety of private interests of the persons subject to *471 the warrantless search or seizure. Of primary concern, of course, is the degree of personal intrusion which the investigatory procedure involves. See, e.g., Martinez-Fuerte, 428 U.S. at 557-558, 96 S.Ct. at 3082-83. Implicated in that inquiry are such questions as whether the intrusion is for regulatory or other civil purposes, or to discover contraband or evidence of crime (see, e.g., Donovan, 452 U.S. at 598-599, 101 S.Ct. at 2537-38; Kirk, 202 N.J. Super. at 55); whether the intrusion involves a search or only an inquiry (see, e.g., Martinez-Fuerte, 428 U.S. at 565, 96 S.Ct. at 3086), and whether the intrusion is of the person (see, e.g., Davis, 104 N.J. 490) or a residence (see, e.g., Camara, 387 U.S. at 530-531, 87 S.Ct. at 1731-32) or an automobile (see, e.g., Martinez-Fuerte, 428 U.S. at 545-546, 96 S.Ct. at 3077), or commercial premises (see, e.g., See v. City of Seattle, 387 U.S. at 543-544, 87 S.Ct. at 1739). In evaluating the personal intrusion, the fact that it occurs without any individualized suspicion weighs heavily against a finding of reasonableness. As the Supreme Court said in Martinez-Fuerte, 428 U.S. at 560, 96 S.Ct. at 3084, "some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure." See also T.L.O., 469 U.S. at 342 n. 8, 105 S.Ct. at 744 n. 8.
In a welter of recent cases, courts throughout the country have been called upon to weigh the competing public and private interests in drug/urine testing of public employees. Virtually all of the reported cases have concluded that such testing is unconstitutional in the absence of some reasonable individualized suspicion. See American Fed. of Gov't Employees, AFL-CIO, 651 F. Supp. 726 (Department of Defense civilian police officers); Nat'l Treasury Employees Union, 649 F. Supp. at 387 (customs service workers); Penny v. Kennedy, 648 F. Supp. 815, 817 (E.D.Tenn. 1986) (police); Lovvorn v. City of Chattanooga, 647 F. Supp. 875, 880 (E.D.Tenn. 1986) (fire fighters); Capua, 643 F. Supp. at 1516-1520 (fire fighters and police officers); Jones v. McKenzie, 628 F. Supp. 1500, 1507-1508 (D.D.C. 1986) (school bus attendant); City of Palm Bay, *472 475 So.2d at 1325 (police and fire officers); Caruso, 506 N.Y.S.2d at 799 (police officers assigned to Organized Crime Bureau); Patchogue-Medford Congress v. Bd. of Educ., 119 A.D.2d 35, 505 N.Y.S.2d 888, 891 (N.Y. App. Div. 2nd Dept. 1986) (teachers). Other cases have upheld urine testing where the employer had reasonable individualized suspicion of drug use. Everett v. Napper, 632 F. Supp. 1481 (N.D.Ga. 1986) (fire fighter); Allen, 601 F. Supp. 482 (municipal utility employees); Div. 241 Amalgamated Transit Union v. Suscy, 538 F.2d 1264 (7th Cir.1976), cert. den. 429 U.S. 1029, 97 S.Ct. 653, 50 L.Ed.2d 632 (1976) (municipal bus drivers); Turner v. Fraternal Order of Police, 500 A.2d 1005 (D.C. 1985) (police officers); King v. McMickens, 120 A.D.2d 351, 501 N.Y.S.2d 679 (N.Y. App. Div. 1st Dept. 1986) (corrections officer).
The reasoning of these cases is quite similar. All recognize that a public employer has an important and legitimate interest in assuring that its employees abstain from drug use because drug use can impair job performance and put the public at risk. McDonell, 809 F.2d at 1308; Div. 241 Amalgamated Transit Union, 538 F.2d at 1267; Penny, 648 F. Supp. at 817; Lovvorn, 647 F. Supp. at 879; Capua, 643 F. Supp. at 1516-1517; Everett, 632 F. Supp. at 1485-1486; Turner, 500 A.2d at 1008; City of Palm Bay, 475 So.2d at 1326; Caruso, 506 N.Y.S.2d at 793; Patchogue-Medford Congress, 505 N.Y.S.2d at 891. See Nat'l Treasury Employees Union, 649 F. Supp. at 387; Jones, 628 F. Supp. at 1508. Moreover, a public employee must be regarded as having a diminished expectation of privacy in his or her role as an employee. Lovvorn, 647 F. Supp. at 880; Turner, 500 A.2d at 1008; City of Palm Bay, 475 So.2d at 1324; Caruso, 506 N.Y.S.2d at 793. On the other hand, mandatory urine testing involves a highly intrusive procedure which carries a variety of consequences and risks for the persons tested. Nat'l Treasury Employees Union, 649 F. Supp. at 387; Lovvorn, 647 F. Supp. at 880; Capua, 643 F. Supp. at 1514; Caruso, 506 N.Y.S.2d at 792. In weighing the public need against the private intrusion, the courts are persuaded by the *473 absence of a factual showing that drug use is widespread among the affected employees or that it presents an identifiable risk to the public. See Nat'l Treasury Employees Union, 649 F. Supp. at 390; Lovvorn, 647 F. Supp. at 882; Penny, 648 F. Supp. at 816-817; Capua, 643 F. Supp. at 1516; City of Palm Bay, 475 So.2d at 1325; Caruso, 506 N.Y.S.2d at 795, 799; Patchogue-Medford Congress, 505 N.Y.S.2d at 891. The reasonable individualized suspicion test fairly accommodates the legitimate interest of employee privacy without unduly restricting the public employer's opportunity to monitor and control the use of drugs by its employees. See Penny, 648 F. Supp. at 817; Lovvorn, 647 F. Supp. at 883; Capua, 643 F. Supp. at 1518; Caruso, 506 N.Y.S.2d at 799.
Our research has disclosed only three cases which uphold drug/urine tests of public employees without any showing of reasonable individualized suspicion. In McDonell v. Hunter, the court held that corrections officers may be subjected to urinalysis "performed uniformly or by systematic random selection of those employees who have regular contact with the prisoners on a day-to-day basis in medium or maximum security prisons." (809 F.2d at 1308). In Mack v. United States, 653 F. Supp. 70 (S.D.N.Y. 1986), the court held that the FBI could lawfully require plaintiff, an FBI agent, to submit to urinalysis; although the FBI apparently had some individualized suspicion of plaintiff, Judge Leval did not determine or rest his decision on the reasonableness of that suspicion. And in Rushton v. Nebraska Public Power District, 653 F. Supp. 1510, the court held that annual and random drug screening of public utility employees who had access to "vital areas" of a nuclear power plant was reasonable. Both McDonell and Mack were based in part on findings that the testing was a modest invasion of privacy. In Rushton the court emphasized the diminished expectation of the employees who were already subject to random pat-downs, electronic searches for explosives or metal objects and constant surveillance. However, in all three cases the courts found that the public need for such testing, although *474 not specifically proved, was sufficiently compelling to justify the intrusion.[8]

IV.
Based upon the present record and in light of the authorities discussed, we conclude that the drug/urine testing authorized by Memorandum 85-259 without probable cause or reasonable individualized suspicion is unreasonable and thus constitutionally invalid. Without repeating all that other courts have said about the nature of urine testing, we find that such testing constitutes a significant interference with personal privacy and autonomy. Government monitoring of urine involves an intrusion upon a most private kind of conduct. Both in concept and in practice, that intrusion is profoundly demeaning. Drug testing here also has serious pragmatic implications, including loss of employment and possible criminal prosecution. The protectible privacy interests of plaintiffs are thus very substantial.
The City surely has an important and legitimate interest in assuring that its Narcotic Bureau personnel are drug free. The record, however, does not indicate that drug use within the Narcotic Bureau, or indeed among police officers generally, is extensive or that the public is presently endangered by drug use among police officers. In promulgating the Memorandum, Director Knox pointed only to five positive tests among two recent classes of recruits. He offered no specific evidence of drug use among regular police officers; his laconic references to information received about two Narcotic Bureau officers suggests that possible drug use can effectively be explored by reliance on reasonable individualized suspicion. His principal *475 justifications for his directive were simply that testing would enhance "[p]ublic confidence," "go a long way toward reinforcing credibility" of the police department and "serve the interests of public safety and effective law enforcement by deterring drug use."[9]
While those are proper goals, urine testing without reasonable individualized suspicion is not a proper means to attain them. The abstract interest in enhancing "public confidence" is not of sufficient weight to justify sacrificing the palpable privacy interests of police officers. And surely the general public interest in enforcing drug laws cannot be permitted to set at naught the constitutional protections against unreasonable searches and seizures.
Our weighing of the public and private interests is supported by the Law Enforcement Drug Screening Guidelines promulgated by Attorney General W. Cary Edwards on October 22, 1986, just after this matter was argued before us.[10] Attorney General Edwards there set forth drug testing guidelines which he urged be adopted by all law enforcement agencies in New Jersey. Under those guidelines, police trainees "should be subjected to unannounced drug testing by urinalysis during mandatory basic training"[11] and

*476 Permanently appointed law enforcement officers should be required to undergo further mandatory drug screening whenever there is individualized reasonable suspicion to believe that the officer is unlawfully using drugs. Officers should be tested under these circumstances only with the approval of the county prosecutor or chief executive officer of the department or his designee.
The Attorney General's guidelines are based upon recommendations of the New Jersey Criminal Justice Advisory Council, which the Attorney General had commissioned to "thoroughly research current drug screening programs, existing drug testing technology, and the financial and operational impact of drug testing upon the law enforcement community." The Council urged that "a veteran officer should be tested when there is individualized reasonable suspicion to suspect that he is using illegal drugs." That recommendation was based upon the Council's finding that "reliable data with respect to the percentage of law enforcement officers who use drugs is non-existent" and thus random drug testing of law enforcement officers "cannot be justified by conclusive evidence of their widespread illicit drug use." Random drug testing, the Council concluded, "significantly diminishes morale and ultimately invades the privacy of the overwhelming number of officers who do not use drugs in order to identify those few who do." Furthermore,
[t]he Council believes that objective indications of drug use will adequately identify those law enforcement officers who use illegal drugs. Specific objective factors such as absenteeism, deterioration of work habits, chronic lateness, and confidential information as to illegal drug use constitute reasonable objective bases or reasonable suspicion to suspect that urinalysis will produce evidence of illegal drug use. (footnote omitted).
While the recommendations of the Council and the Attorney General do not address the constitutional question and in any event are not binding on us, they do reinforce our own conclusion from this record that the public interest does not require police officers to be subjected to the drug testing envisioned by Memorandum 85-259. That testing, we hold, is an unreasonable search and seizure and thus unconstitutional.[12]

*477 V.
Our holding is based exclusively on Article I, ¶ 7 of the New Jersey Constitution. While we like to believe that the United States Supreme Court would reach the same result as a matter of federal constitutional law, we offer no such prediction. See State v. Hartley, 103 N.J. 252, 284-285 (1986). Our state constitution protects fundamental rights independently of the United States Constitution and has often been construed, particularly in recent years, as providing greater protection to our citizens' individual rights than accorded them under the federal constitution. See State v. Gilmore, 103 N.J. 508, 522-524 (1986). In particular, our state constitution has been found to afford greater protection against unreasonable searches and seizures than may be required by the United States Supreme Court's interpretation of the Fourth Amendment. State v. Novembrino, 105 N.J. 95 (1987); State v. Hunt, 91 N.J. 338 (1982); State v. Alston, 88 N.J. 211 (1981); State v. Johnson, 68 N.J. 349 (1975).
To be sure, "the discovery of unique individual rights in a state constitution does not spring from pure intuition but, rather, from a process that is reasonable and reasoned." Hunt, 91 N.J. at 367 (Handler, J., concurring). We find ample grounds here to resort to the state constitution. The case implicates important personal rights of public employers and employees of this State. Cf. Novembrino, 105 N.J. at 146; Hartley, 103 N.J. at 285; Hunt, 91 N.J. at 366 (Handler J., concurring). State law, tradition and policy have long given privacy invasions a degree of protection beyond that afforded by the federal constitution. Novembrino, 105 N.J. at 146; Hunt, 91 N.J. at 370-372 (Handler, J., concurring). There is clearly a necessity for our giving firm guidance to our own *478 public employers and employees and to limit the prospect of disarray in decisional treatment of the question. Hartley, 103 N.J. at 285-286. Finally, failure to rest our decision on state law might lead to needless review in the United States Supreme Court, and could in fact require, in some cases, subsequent redundant proceedings in our own courts. Id. at 286. Those considerations, we find justify characterizing the drug/urine testing authorized by Memorandum 85-259 as an unreasonable search and seizure within the meaning of Article I, ¶ 7 of the New Jersey Constitution.

VI.
The final judgment is accordingly reversed. The matter is remanded to the Law Division for the entry of judgment in accordance with this opinion. The Law Division shall also address the Second Count of the complaint insofar as it asserts a claim for damages under 42 U.S.C.A. § 1983 arising from the urine tests taken prior to the entry of the restraints. The trial judge found it unnecessary to address that claim in light of his finding that Memorandum 85-259 was facially constitutional. There is no merit to defendants' argument that plaintiffs had abandoned the claim: the final judgment unequivocally states that plaintiffs had withdrawn only claims relating "to the acquisition and testing of blood samples pursuant to Memorandum 85-259."
Reversed and remanded. We do not retain jurisdiction.

APPENDIX

METHODS AND PROCEDURES FOR URINE/DRUG SCREENING
I. AUTHORITY/APPLICATION/NOTICE
A. The methods and procedures outlined herein shall govern the acquisition and testing of urine for illegal and abusive drugs.
B. The Fraternal Order of Police Lodge No. 12 shall be given thirty (30) days advance written notice of any proposed change regarding the methods and procedures set forth herein. No urine sampling shall be conducted pursuant to any proposed change(s) within the thirty (30) day notice period to allow the Fraternal Order of Police to pursue any action which it deems appropriate. The Fraternal Order of *479 Police Lodge No. 12 shall give thirty (30) days advance written notice of any proposed change regarding the methods and procedures set forth herein.
C. No urine shall be acquired except with the approval of the Police Director or the Chief of Police.
II. LABORATORY METHOD
A. Analysis and Confirmation
1. The Newark Police Department will use the Abuscreen System as developed by Roche Diagnostic Systems, a Division of Hoffman-La Roche, Inc.
2. All positive results from initial screening by the Abuscreen process shall be confirmed by gas chromatography/mass spectrometry (GC-MS).
3. Positive specimen results shall be retained by the laboratory for ninety (90) days following analysis.
4. Unconsumed urine specimens which correspond by identification number to any specimens reported as positive shall be retained by the laboratory until authorization to destroy said unconsumed urine specimens is received by the laboratory from an officer of the Internal Affairs Bureau of the Newark Police Department.
III. SCREENING PROCEDURES
A. Drugs to be Screened
1. Illicit and abusive drugs shall be the subject of screening. Urine shall be screened for:
 amphetamines,
 barbiturates,
 benzodiazepines,
 cannabinoids,
 cocaine,
 methaqualone,
 opiates,
 phencyclidine.
2. The following cut-off values have been established for each drug or drug metabolite. These results shall be reported as negative. These cut-off figures are represented as nanograms per milliliter (ng/mL).

 THC 50 ng/mL
 Opiates 300 ng/mL
 Amphetamine 1,000 ng/mL
 Barbiturates 200 ng/mL
 Benzodiazepines 300 ng/mL
 Phencyclidine 25 ng/mL

*480
 Methaqualone 750 ng/mL
 Cocaine 300 ng/mL

3. These drugs shall not be considered inclusive or exclusive. Certain drug "fads" or custom-made drugs may cause an adjustment in the menu of the drug screen.
B. Monitoring Authority
The Internal Affairs Bureau is the sole unit which may conduct urine acquisition. The Internal Affairs Bureau shall:
1. Designate a superior officer from the Internal Affairs Bureau to supervise all urine acquisition.
2. Ensure that one member of the Internal Affairs Bureau together with the Police Surgeon or one other medical person shall witness all voids. The Internal Affairs Bureau representative is considered the official monitor. The presence of the Police Surgeon or one other medical person is mandatory throughout all steps of the urine collection process. No voiding shall occur in the absence of the Police Surgeon or other medical person unless the employee specifically requests in writing that the Police Surgeon or other medical person not witness the void.
3. Ensure that the Monitor is of the same sex as the employee voiding.
4. Inspect for accuracy, prior to the time of voiding, all written submissions, such as identification numbers, labelling requirements, lab analysis request forms, etc. as set forth in Section D below.
5. Inspect specimen bottles prior to the time of voiding for signs of apparent pre-voiding tampering.
6. Prepare and retain a log identifying by name and rank of all members of the Internal Affairs Bureau who are present during the urine acquisition process, the name, address and phone number of all medical persons present during the urine acquisition process and the identification number of all police officers employee tested. The Internal Affairs Bureau shall provide the president of the F.O.P. Lodge No. 12 with a copy of this log within twenty-four (24) hours of urine acquisition.
C. Time and Place of Sampling
1. The Internal Affairs Bureau is responsible for scheduling urine acquisition with the approval of the Police Director or the Chief of Police, during a scheduled tour of duty.
2. Screening shall be conducted as a group, either by squad, organized unit, shift, etc. except in situations in which there are staggered work schedules or an individual is *481 not present when his group is tested which in that event the individual(s) will be tested in a subsequent group screening.
3. The location for the actual voiding must be in a recognized restroom. For screening of members of the Narcotic Bureau, the restroom in the Captain's office shall be utilized.
4. Only the Internal Affairs Bureau representative, the Police Surgeon or one other medical person, and the person voiding shall be present in the restroom and the Internal Affairs Bureau shall take all precautions or actions necessary to ensure that the act of voiding shall not be within the view of any person(s) other than the monitors.
D. Sampling Procedure
1. The employees submitting the urine sample shall:
a. Print his/her employee serial number from his/her identification card in the area designated for "patient's name" and the date on the pre-attached label of the specimen bottle prior to voiding. No employee names are to be used.
b. Print his/her employee serial number from his/her identification card in the area designated for "patient's name" and the date on the lab request form (Chain of Custody Request Form) prior to voiding.
c. Void fifty (50) mL of urine in the specimen bottle.
d. Secure the cap of the specimen bottle.
e. Wrap evidence tape around the specimen bottle, starting at the top of the bottle and continuing down one side and up the opposite side so the evidence tape overlaps the top or starting point.
f. Place the lab request form (Chain of Custody Request Form) in a plastic bag along with the specimen bottle.
g. Seal the top portion (sealed section) of the plastic bag with evidence tape.
h. Surrender the plastic bag containing the specimen bottle and lab request form to the Internal Affairs Bureau representative.
2. The Monitors shall:
a. Initial and date the pre-attached label of the specimen bottle provided to the Monitors by the employee after voiding.

*482 3. The Internal Affairs Bureau shall:
a. Supply the employees with all necessary materials required pursuant to Section E 1. above including one wide-mouth, screw-capped, specimen bottle having at least a 50mL retention capacity and having a cap containing a self-sealing liner which would reveal post-collection tampering.
b. Initial evidence tape after the specimen bottle is wrapped.
c. Arrange for courier pick-up by the contracted lab.
d. Place plastic bag containing specimen surrendered by employee in a secured storage area until pick-up by the lab courier.
e. Not place any other items in the secured storage area.
f. Control and limit the keys for such storage area and maintain log of all openings.
g. Ensure all samples are intact prior to relinguishing control to courier.
h. Maintain all results of urinalysis as confidential.
IV. DRUG SCREEN RESULTS
A. Confidentiality
1. The contracted lab shall communicate all lab analysis results to the City of Newark Police Director either verbally or by mailing the same to the Police Director marked "Confidential".
B. Negative Results
1. The Police Director shall require a representative of the Internal Affairs Bureau to make available the lab analysis results confirming that the urine has been tested "Negative" for drugs, to an employee within seven (7) working days of the employee's request to view the results of analysis or to receive a copy of lab analysis results.
2. An employee may request to view the lab results or receive a copy of the lab analysis results by verbally making such request to the Internal Affairs Bureau and by making an appointment with same, or by submitting a formal request to his commanding officer who shall then immediately forward such request to the Internal Affairs Bureau.
C. Positive Results
In instances where there are positive results of screened drugs in the employee's sample:

*483 1. The employee is to be confidentially informed of the results immediately in writing simultaneously mailed by certified mail and by first-class mail marked "CONFIDENTIAL" and addressed to the individual at his home address, which writing shall state: "There is a positive urinalysis for (insert). Your options are annexed hereto. You are entitled to consult a representative of the Fraternal Order of Police Lodge No. 12 or your labor union and anyone else you wish to assist you. Attached to said writing shall be an exact listing entitled "OPTIONS" of procedures identified herein as Secs. IV C.2, C.3, Sec. V A, A.1, B and C and Sec. VI A, B and C.
2. The employee is to be given the opportunity prior to disciplinary proceedings to substantiate to the Police Director the reason for presence of such drugs in his/her sample by submitting a written request to the Police Director for an interview immediately.
3. If unsubstantiated, the employee is to be subject to disciplinary proceedings.
V. EMPLOYEE OPTIONS
Employees found to have positive results, not substantiated by medical testimony or otherwise, shall:
A. Be given the opportunity prior to administrative proceedings to submit his resignation with the understanding that he will not be entitled to be re-hired by the City of Newark.
1. In the event of resignation, the Police Director shall order the Internal Affairs Bureau both to destroy the employee's lab analysis results and any other documents relating thereto, and to notify the contracted lab to destroy the positive specimen results and unconsumed urine specimen corresponding to the employee's identification number and any and all documents related thereto.
B. Have the right to challenge the results of the test by the procedure delineated in Section VI.
C. Be subject to termination upon completion of administrative proceedings in the event of a finding of guilty.
VI. PROCEDURE TO CHALLENGE POSITIVE DRUG RESULTS
A. An Employee may challenge the results of a positive drug screening result by making a written application to the Police Director within fifteen (15) days of mailing of notice to him that there are positive results of a screened drug in the employee's sample.
B. The employee must then provide for private testing of the urine specimen by the identical method of screening and confirmation which is set forth herein.

*484 C. The employee must accompany or provide an agent to accompany a member of the Internal Affairs Bureau and the original urine sample from the City contracted lab to the lab of his/her choosing. Transportation expenses shall be borne by the employee concerned.
NOTES
[1] The blood test requirement was withdrawn by consent during the pendency of the trial court proceedings.
[2] The trial judge also rejected plaintiffs' contention that Director Knox exceeded his statutory authority in promulgating the Memorandum; plaintiffs do not challenge that ruling on this appeal.
[3] Shortly after the trial judge issued his opinion, Director Knox promulgated a directive requiring drug/urine testing of all police department personnel. We understand an action has been filed to invalidate that directive, that implementation of the directive was temporarily enjoined and that the litigation has been stayed pending final disposition of this appeal.
[4] The City does not argue that an officer's acceptance of assignment to the Narcotic Bureau can be regarded as a valid consent to an otherwise unreasonable search. See, generally, McDonell, 809 F.2d at 1310; Caruso, 506 N.Y.S.2d at 793-794.
[5] Probable cause is defined as "a `well grounded suspicion' that a crime has been or is being committed." State v. Martin, 87 N.J. 561, 568 (1981) (quoting State v. Burnett, 42 N.J. 377, 387 (1964)).
[6] Drug testing that is conducted as part of a bona fide health checkup is not constitutionally objectionable. See Caruso, 506 N.Y.S.2d at 798. At oral argument plaintiffs conceded that they would have no objection to such testing.
[7] The court in Caruso noted that Shoemaker may be "simply out of step with the rest of the authorities." Ibid.
[8] Governmentally authorized drug testing of persons other than public employees has been upheld in some cases. See, e.g., Shoemaker, 795 F.2d 1136 (jockeys); Storms, 600 F. Supp. 1214 (prison inmates). As our earlier discussion of Shoemaker suggests, such cases involve a different mix of public and private interests and are not of significant guidance here.
[9] In a post-judgment affidavit submitted in opposition to plaintiffs' motion for stay pending appeal, the Director also said that two Newark officers had recently been arrested for possession and distribution of narcotics. The record is silent as to any connection between the investigations preceding those arrests and Memorandum 85-259.
[10] Immediately after the guidelines were promulgated, we inquired whether the City intended to adopt them and withdraw Memorandum 85-259. The City responded that it would comply with legislation implementing the guidelines, which the Attorney General had announced he would seek. The City accordingly moved for a stay of the appeal pending action by the Legislature. We denied that motion. The Legislature has not yet acted.
[11] In this matter we need not, and do not, pass upon the propriety of random drug testing of police trainees.
[12] We need not determine here whether public employees engaged in extra-hazardous activities may fairly be subjected to drug tests without reasonable individualized suspicion. Cf. Rushton, 653 F. Supp. 1510 (public utility employees with access to vital areas at nuclear power plant); Allen, 601 F. Supp. 482 (municipal employees working with high voltage wires). No claim was made here that the police officers subject to testing were so engaged.