**Raul FELICIANO, Jr., et al. Plaintiffs,**

v.

**CITY OF CLEVELAND, et al. Defendants.**

**Civ. A. C85–3356.**

United States District Court,
N.D. Ohio, E.D.

June 12, 1987.

Brian Schorr and Edward A. Icove, Lustig, Icove & Lustig, Cleveland, Ohio, for plaintiffs.

Irving Berger, Asst. Director of Law, Robert M. Wolff, Chief Asst. Director of Law, Cleveland, Ohio, for defendants.

MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

Plaintiffs Raul Feliciano, Jr. and Richard Rojas filed this action on November 13, 1985, after resigning from the cadet class

of the City of Cleveland Police Department. Their lawsuit challenges the constitutionality of the drug testing by urinalysis administered during their last week of peace officer training, which they maintain violated their rights under the fourth, fifth and fourteenth amendments to the United States Constitution. Named as defendants are former Safety Director Reginald M. Turner and former Chief of Police William T. Hanton, along with subordinates who allegedly performed the drug testing under their supervision or control, Sergeant Lloyd Bratz, Sergeant William Bartley, Lieutenant Glen Groudel, and Sergeant Ronald James (together, "the individual defendants"), and the City of Cleveland ("the City").

On April 28, 1986, the City of Cleveland filed a motion for summary judgment on the merits of this action. It was superceded by defendants' supplemental motion for summary judgment, which was filed on August 13, 1986 and joined by the individual defendants. Plaintiffs' deadline for responding to the supplemental summary judgment motion was extended while they sought the requisite discovery. By its Order of November 12, 1986, this Court approved the parties' agreement to postpone further discovery (and by logical extension plaintiffs' response to defendants' summary judgment motion on claims other than the fourth amendment) until this Court could rule upon plaintiffs' motion for partial summary judgment on their fourth amendment claims. Plaintiffs' motion for partial summary judgment was filed on December 12, 1986. These cross-motions for summary judgment on plaintiffs' fourth amendment claims are now before this Court, as well as the individual defendants' supplemental motion for dismissal or summary judgment, filed April 16, 1987.

For the reasons set forth below, plaintiffs' motion for partial summary judgment is granted against the City, and defendants' motion for summary judgment on the fourth amendment claims is denied. The individual defendants' supplemental motion for dismissal on the basis of qualified immunity is granted with respect to fourth amendment claims and deferred with respect to plaintiffs' other claims.

Jurisdiction is present pursuant to 28 U.S.C. § 1343(3) (1982) and 28 U.S.C. §§ 2201 and 2202 (1982).

## I. FACTS

The facts of relevance to the motions before this Court are not in dispute. During the week of October 7, 1985, then Chief of Police Hanton received a tip that current members of the police academy were known to use narcotics. Deposition of William T. Hanton ("Hanton dep."), at 4–5. Because no names of implicated cadets were mentioned, Hanton decided that the entire class should be tested for drug abuse. Hanton testimony before Civil Service Commission ("Hanton CSC"), at 36–37. A testing plan was developed by Hanton and the medical bureau, Hanton Dep., at 8–9, and Hanton decided to conduct the first surprise drug test of police cadets in Cleveland. Hanton CSC, at 38. When Hanton made his decision with respect to testing, he had no reasonable suspicion of drug use directed at any particular member of the class, including Feliciano and Rojas. *Id.* at 37; Answer, ¶ 7.

During the morning of Monday, October 21, 1985, all cadets were required to produce urine samples. Answer, ¶ 7. At that time, plaintiffs were beginning their final week of training, and they had already satisfactorily passed a physical examination. Answer, ¶ 6. The cadets were directed to go to a restroom row-by-row from their classroom. Sgt. Bratz informed them that they were undergoing additional medical screening. Deposition of Raul Feliciano, Jr. ("Feliciano dep."), at 18–20. However, the persons administering the test wore guns, which was unusual at the academy. Feliciano affidavit of November 12, 1986, at ¶ 3; Rojas affidavit of November 12, 1986, at ¶ 5. The cadets were provided containers labeled with their names and badge numbers and instructed to produce a urine sample. *Id.* at 21–22; deposition of Richard Rojas ("Rojas dep."), at 16. Feliciano produced a sample in a toilet stall. Feliciano dep., at 25. Because all stalls

were occupied when Rojas reached the restroom, he was forced to produce his sample in the open at a urinal, where he was watched by Sgt. Bratz and another person. Rojas dep., at 16. He was unable to urinate despite "forcing" himself until forty-five minutes had elapsed. *Id.* at 17.

When a sample was obtained, it was returned to a box with other samples. Feliciano dep., at 25; Rojas dep., at 17. The cadets gathered in a lounge until everyone had produced a sample. Rojas dep., at 18. Sgt. Bratz entered the lounge and indicated that he did not know what was happening with respect to the sample collection. When everyone had finished, the cadets returned to the classroom. *Id.*

The cadets' urine samples were sent to Smith Kline Miles Laboratory in Beachwood, Ohio, where they were screened for the most commonly abused drugs, including marijuana and cocaine. Karin Rash testimony before Civil Service Commission ("Rash CSC"), at 7. The samples provided by Rojas and Feliciano tested positive for marijuana. Rash CSC, at 12. Their samples were retested the next day, with the same results. Rash CSC, at 13.

On October 22, 1985, Feliciano and Rojas were separately interviewed by a panel of three officers. Feliciano dep., at 26; Rojas dep., at 19. Each was told that traces of marijuana had been found in his urine. Feliciano testimony before Civil Service Commission ("Feliciano CSC"), at 31–32; Rojas testimony before Civil Service Commission ("Rojas CSC"), at 6. Both plaintiffs maintained that they had been present at parties the prior weekend at which marijuana had been smoked, but that they had not smoked it themselves. Feliciano dep., at 28; Rojas dep., at 21. The panel informed Feliciano and Rojas that they had the options of resigning or facing termination by Safety Director Turner the next day. Feliciano CSC, at 34; Rojas CSC, at 6, 14–15.

After roll-call on October 23, 1985, several cadets were separated from those in the classroom. At about 2:30 p.m., Chief of Police Hanton, accompanied by other officers, told these cadets that at 4:00 p.m.

they would be terminated for violating their probation period. Rojas CSC, at 7–8; Hanton CSC, at 3–7. After Hanton and the other officers left, Sgt. James brought letters of resignation, which he indicated could be submitted by the cadets to be terminated. Rojas CSC, at 8; Feliciano CSC, at 29. Feliciano and Rojas signed these resignation letters. Rojas CSC, at 9; Feliciano CSC, at 29. After a hearing, the Civil Service Commission determined that Feliciano and Rojas' resignations were voluntary and not coerced.

## II. STANDARDS FOR SUMMARY JUDGMENT

Fed.R.Civ.P. 56(c) governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law....

The nature of materials properly presented in a summary judgment pleading is set forth in Fed.R.Civ.P. 56(e):

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.... The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the

burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett,* —— U.S. ——, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In reviewing summary judgment motions, this Court must view the evidence in the light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Hasan v. CleveTrust Realty Investors, Inc.,* 729 F.2d 372 (6th Cir.1984). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.,* —— U.S. ——, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil trials the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* 106 S.Ct. at 2512. Although "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient" to defeat a summary judgment motion, the Court is not precluded from denying a summary judgment motion where it concludes that proceeding to trial is a better course. *Id.* at 2512, 2514.

## III. QUALIFIED IMMUNITY OF THE INDIVIDUAL DEFENDANTS

█ On January 22, 1986, the individual defendants moved for dismissal or summary judgment on the ground of qualified immunity. That motion was denied by this Court on April 11, 1986, and an interlocutory appeal was taken. A year later, the Sixth Circuit reversed this Court's decision. After making clear that the defendants' qualified immunity appeal implicated only plaintiffs' fourth amendment claims, the court concluded:

[O]ur determination does not affect in any way the right of the plaintiffs to pursue the remainder of their claims against these defendants or against the City of Cleveland. We only hold that the trial judge was obliged to determine upon the motion made by the defendants that they were immune from personal liability in damages for any claim of violation of fourth amendment rights arising from the mandated urine testing.

*Feliciano v. City of Cleveland,* No. 86–3436, slip op. at 3 (6th Cir. April 10, 1987) [816 F.2d 679 (table) ]. Thus, to the extent that defendants' supplemental motion for dismissal or summary judgment, filed on April 16, 1987, requests that this Court dismiss the fourth amendment claims against the individual defendants as mandated by the Sixth Circuit, that motion is granted.

The supplemental motion also requests that judgment be entered for the individual defendants on the remaining claims of plaintiffs' complaint, or that these claims against them be dismissed. Plaintiffs have objected to the motion on procedural grounds. This Court is unpersuaded by plaintiffs' procedural arguments. Judgment is reserved on the motion, however, until plaintiffs respond on the merits. Plaintiffs' response shall be filed within ten (10) days.

## IV. FOURTH AMENDMENT ANALYSIS

█ The fourth amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

It is applied to the states and their subdivisions through the fourteenth amendment, *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), and it restricts the activities of civilian authorities, as well as law enforcement officers. *New Jersey v. T.L.O.,* 469 U.S. 325, 335–37, 105 S.Ct. 733, 740–41, 83 L.Ed.2d 720 (1985). Thus, the conduct of governmental employers is governed by the fourth amendment. *O'Con-*

*nor v. Ortega*, —— U.S. ——, 107 S.Ct. 1492, 1497, 94 L.Ed.2d 714 (1987) (plurality opinion).

 The fourth amendment does not restrict all searches and seizures by government, but it does prohibit all *unreasonable* searches and seizures. Accordingly, analysis of an alleged fourth amendment violation proceeds in two steps. First, the Court must determine whether the government's conduct constitutes a search or seizure by infringing a legitimate expectation of privacy. If a search or seizure is indicated, the Court must then determine whether the search or seizure was reasonable. *See O'Connor*, 107 S.Ct. at 1495. However, even a search or seizure which would be prohibited if effected against the will of the person whose privacy expectation was invaded is valid if it was authorized by consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973) (citing *Katz v. United States*, 389 U.S. 347, 358, 88 S.Ct. 507, 515, 19 L.Ed.2d 576 (1967), and *Vale v. Louisiana*, 399 U.S. 30, 35, 90 S.Ct. 1969, 1972, 26 L.Ed.2d 409 (1970)).

 While many judicial decisions regarding the constitutionality of drug testing by governmental actors have been rendered during the past year and a half, this Court believes that the framework for its analysis is dictated by an opinion arising in a slightly different context. In *O'Connor v. Ortega*, 107 S.Ct. at 1492, the Supreme Court recently made its first attempt to delineate the fourth amendment rights of public employees. The case arose from the warrantless search of the office, desk and filing cabinets of a physician employed in a state hospital. While the interests implicated by such a search are obviously different from those involved in a urinalysis to test for drug use, the principles adopted by the Supreme Court in its analysis are con-

trolling on this Court. Indeed, the *O'Connor* plurality broadly identified the second issue it faced as "the appropriate Fourth Amendment standard for a search conducted by a public employer in areas in which a public employee is found to have a reasonable expectation of privacy." 107 S.Ct. at 1495. The parameters of this issue as framed by the Supreme Court clearly encompass the inquiry this Court must make if it determines that urinalysis for drug testing is a search or seizure. This Court turns to the preliminary issue, then, beginning with the guidance offered by *O'Connor*.[1]

### A. *Compelled Urinalysis is a Search*

*O'Connor*'s precedential value is unfortunately diminished by the Supreme Court's inability to muster an opinion of the Court. There appears to be no disagreement that the fourth amendment will apply to a public employer's conduct which infringes "an expectation of privacy that society is prepared to consider reasonable." *O'Connor*, 107 S.Ct. at 1497 (quoting *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984)). The plurality indicates that a public employee's expectation of privacy "must be assessed in the context of the employment relationship," requiring a case-by-case analysis. *O'Connor*, 107 S.Ct. at 1498. However, Justice Scalia, whose concurrence was necessary to reverse and remand the case, clearly disagrees with the plurality's analysis on this issue. He rejects the case-by-case standard as "devoid of content" and indicates that the question of "whether Fourth Amendment protections apply ... must be answered on a more 'global' basis." Justice Scalia concludes that he would generally hold that government employees are entitled to fourth amendment safeguards, and would consider factors unique to each workplace situa-

---

1. In *Guiney v. Roache*, 654 F.Supp. 1287 (D.Mass.1987), a federal district court held that the abstention doctrine of *Railroad Commission of Texas v. Pullman*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) required that it refuse to consider a fourth amendment challenge to a drug testing program, since the Massachusetts Constitution offers broader protection against searches and seizures. Section 14, Article 1 of the Ohio Constitution, which prohibits unreasonable searches and seizures, is identical in scope with the fourth amendment. *Houck v. State*, 106 Ohio St. 195, 199, 140 N.E. 112 (1922). Thus, *Pullman* abstention is not indicated in this case. *See Rushton v. Nebraska Public Power District*, 653 F.Supp. 1510, 1529 (D.Neb.1987).

tion when determining whether a search was "reasonable." *Id.* at 1505. In contrast, the opinion of the four dissenting justices appears to agree with the plurality that "'operational realities' of the workplace" must be evaluated when determining whether public employer conduct is restricted by the fourth amendment, but it disagrees with the plurality with respect to how such an evaluation should be performed. *Id.* at 1508.

■ Whatever the formulation of the analysis of legitimate expectation of privacy, this Court believes that the Supreme Court would join with Justice Scalia's inclination to find that drug testing of public employees inevitably triggers fourth amendment protection. Unlike *O'Connor*, which raised the spectre of daily constitutional decisions by ordinary government employees involved in ordinary office interactions, a constitutional challenge to drug testing by urinalysis involves activity which is extraordinary in the context of virtually any employment relationship. "Operational realities" need not be analyzed in each case of urinalysis, since the conclusion that there is an expectation of privacy is inevitable.

The federal and state courts which have ruled upon the constitutionality of drug testing by urinalysis have been almost unanimous in their conclusion that the procedure is a search and/or a seizure within the meaning of the fourth amendment. The reasons for this conclusion, however, have varied from case to case. Many courts have decided that this result is dictated by *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), where the Court held that a withdrawal of a blood sample from a suspect, over the suspect's objections, constituted a search within the fourth amendment. *E.g. McDonell v. Hunter*, 809 F.2d 1302, 1307 (8th Cir.1987); *Lovvorn v. City of Chattanooga*, 647 F.Supp. 875, 879 (E.D.Tenn.1986), *appeal docketed*, No. 86–6281 (6th Cir. Dec. 16, 1986); *Allen v. City of Marietta*, 601 F.Supp. 482, 488 (N.D.Ga.1985); *Storms v. Coughlin*, 600 F.Supp. 1214,

1218 (S.D.N.Y.1984); *Macias v. State*, 649 S.W.2d 150, 152 (Tex.App.1983).

Other courts have more explicitly set forth their rationales for finding that urinalysis for drug testing by public entities implicates the fourth amendment. Several have pointed to the disclosure of personal "physiological secrets" as the basis of their holding. *National Treasury Employees Union v. Von Raab*, 816 F.2d 170 (5th Cir.1987), *application for stay denied mem.*, —— U.S. ——, 107 S.Ct. 2479, 96 L.Ed.2d 372 (1987); *McDonell*, 809 F.2d at 1307; *Capua v. City of Plainfield*, 643 F.Supp. 1507, 1513 (D.N.J.1986); *Bostic v. McClendon*, 650 F.Supp. 245, 249 (N.D.Ga. 1986); *Caruso v. Ward*, 133 Misc.2d 544, 547, 506 N.Y.S.2d 789, 792 (N.Y.Sup.Ct. 1986). A few courts have specifically objected to public employees monitoring their employees' off-duty conduct by urinalysis. *American Federation of Government Employees v. Weinberger ("AFGE")*, 651 F.Supp. 726, 732 (S.D.Ga.1986); *Capua*, 643 F.Supp. at 1514. The privacy usually associated with the act of urination has also been persuasive. *E.g. Von Raab*, 816 F.2d at 175.

Based upon the weight of the precedent holding that urinalysis is a fourth amendment search or seizure, numerous courts have simply adopted that holding without independent analysis. *National Federal of Federal Employees v. Weinberger ("NFFE")*, 818 F.2d 935 (D.C.Cir.1987); *Spence v. Farrier*, 807 F.2d 753, 755 (8th Cir.1986); *Railway Labor Executives' Ass'n v. Long Island Railroad Co.*, 651 F.Supp. 1284 (E.D.N.Y.1987); *Pella v. Adams*, 638 F.Supp. 94, 98 (D.Nev.1986); *Jones v. McKenzie*, 628 F.Supp. 1500, 1508 (D.D.C.1986); *Patchogue-Medford Congress of Teachers v. Board of Education*, 119 A.D.2d 35, 38, 505 N.Y.S.2d 888, 890 (N.Y.App.Div.1986), *aff'd*, 70 N.Y.2d 57, 517 N.Y.S.2d 456, 510 N.E.2d 325 (1987). In still other cases, either the defendants did not dispute the applicability of the fourth amendment, or the court assumed that fourth amendment analysis was appropriate without discussion. *Shoemaker v. Handel*, 795 F.2d 1136, 1141 (3d Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 577, 93 L.Ed.2d 580

(1986); *United States v. Williams,* 787 F.2d 1182, 1185 (7th Cir.1986); *Tucker v. Dickey,* 613 F.Supp. 1124 (D.C.Wisc.1985); *Anable v. Ford,* 653 F.Supp. 22 (W.D.Ark.1985); *Turner v. Fraternal Order of Police,* 500 A.2d 1005 (D.C.App.1985); *City of Palm Bay v. Bauman,* 475 So.2d 1322 (Fla.App. 1985); *Fraternal Order of Police v. City of Newark,* 216 N.J.Super. 461, 524 A.2d 430 (N.J.Super.Ct.App.Div.1987); *King v. McMickens,* 120 A.D.2d 351, 501 N.Y.S.2d 679 (N.Y.App.Div.1986), *aff'd sub nom. Perez v. Ward,* 69 N.Y.2d 840, 514 N.Y. S.2d 703, 507 N.E.2d 296 (1987); *Hampson v. Satran,* 319 N.W.2d 796 (N.D.1982). *But see Everett v. Napper,* 632 F.Supp. 1481, 1484 (N.D.Ga.1986) (no search where plaintiff refused to submit to urinalysis demand); *Turner,* 500 A.2d at 1011 (Nebeker, concurring) (because there is no expectation of privacy in urine after it is discharged, there is no seizure within the fourth amendment).

Despite the large number of decisions holding that drug testing is a search or a seizure under the fourth amendment (many of which have been rendered since the filing of the defendants' most recent brief on the merits), the City contests this issue. Its primary argument is that urinalysis is not comparable to the blood test found to be a "search" in *Schmerber,* because there is no penetration of the body. Instead, the City submits, urinalysis is analogous to the compelled submission of hair samples, fingerprints, and voice exemplars, which are *"de minimus"* intrusions. The City's argument is based upon a misconception of *Schmerber* in specific, and of the privacy interests protected by the fourth amendment in general.

While the Supreme Court did speak disapprovingly of "intrusions beyond the body's surface" when discussing the justification for the blood test in *Schmerber,* the extent of the intrusion was not relevant to whether the blood test was a "search" within the meaning of the fourth amendment. The Court stated that the fourth amendment's "overriding function" is "to protect personal privacy and dignity against unwarranted intrusion by the State," thus substantially overlapping with the values implicit in the fifth amendment. 384 U.S. at 767, 86 S.Ct. at 1834. Emphasizing that the fourth amendment protects against unreasonable searches of "persons," the Court indicated that it was obvious that fourth amendment constraints applied to the blood test—a proposition not disputed by the respondent in that case. *Id.*

Although the *Schmerber* court was writing on a clean slate with respect to intrusions involving the human body, *id.* at 767–68, 86 S.Ct. at 1834, it was soon called upon to develop the concept of fourth amendment "searches of the person." As noted by the City, the Supreme Court held that the fourth amendment was not implicated merely by obtaining fingerprints, *Davis v. Mississippi,* 394 U.S. 721, 727, 89 S.Ct. 1394, 1397, 22 L.Ed.2d 676 (1969), a voice exemplar, *United States v. Dionisio,* 410 U.S. 1, 9, 93 S.Ct. 764, 769, 35 L.Ed.2d 67 (1973), or a handwriting exemplar, *United States v. Mara,* 410 U.S. 19, 21–22, 93 S.Ct. 774, 775–776, 35 L.Ed.2d 99 (1973). These decisions relied upon the fact that the "intrusions" involved "physical characteristics" that are "constantly exposed to the public," *Mara,* 410 U.S. at 21, 93 S.Ct. at 776, but "none of the probing into an individual's private life and thoughts that mark an interrogation or search." *Davis,* 394 U.S. at 727, 89 S.Ct. at 1398. This critical distinction was emphasized in *Cupp v. Murphy,* 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973), where the police took scrapings from a suspect's fingernails over his protestations. Distinguishing the aforementioned cases as involving publicly exposed physical characteristics, the Court held that the suspect had been subjected to a search which "constituted the type of 'severe, though brief, intrusion upon cherished personal security' that is subject to constitutional scrutiny." *Id.* at 295, 93 S.Ct. at 2003 (quoting *Terry v. Ohio,* 392 U.S. 1, 24–25, 88 S.Ct. 1868, 1882, 20 L.Ed.2d 889 (1968)).

■ *Cupp* makes clear that penetration of the skin was not the key to *Schmerber*'s holding that the fourth amendment pre-

scribes limitations on such searches of the person, and that a characterization of an intrusion as "major" or "minor" is not critical to deciding whether a "legitimate expectation of privacy" exists. Instead, *Schmerber* rests upon the well-established proposition that that which is exposed to public perception is not protected by the fourth amendment, while that which requires action to expose legitimately concealed contents is so protected. *Cf. United States v. Dunn*, —— U.S. ——, 107 S.Ct. 1134, 1141, 94 L.Ed.2d 326 (1987) (discussion of the "open field" doctrine); *Arizona v. Hicks*, —— U.S. ——, 107 S.Ct. 1149, 1152, 94 L.Ed.2d 347 (1987) (confirming the crucial difference between looking at a stereo in plain view and moving it even a few inches to expose its serial number).

■■■■■ This Court agrees with those courts which have held that the inquiry into the physiological secrets contained in urine is a search within the meaning of the fourth amendment, despite the fact that urine is routinely discharged and that urinalysis does not require penetration of the skin. This search involves "probing into an individual's private life" as surely as if an employer would enter an employee's home to inspect for drugs or other contraband or to obtain more information about that employee. Urinalysis reveals much information in addition to whether a person has recently ingested, or been exposed to, illicit drugs; it also discloses whether a person is under treatment for a disease, suffers from a disease such as diabetes, or is pregnant. *Van Raab*, 816 F.2d at 175–76. But even if urinalysis were restricted to seeking information about illicit drug use, it would still invade personal privacy. The fourth amendment requires that such invasions of privacy be carefully controlled, even though the government's end in an investigation is justified. In addition, this Court agrees that the act of urination is uniquely private, so that the supervised collection of a sample also implicates the fourth amendment. *Cf. Kent v. Johnson*, 821 F.2d 1220, 1226–27 (6th Cir.1987) (reversing dismissal of claim that state prisoner allegedly forced to unnecessarily expose his body to female guards suffered a fourth amendment violation). It joins the courts which have distinguished the cases involving routinely exposed physical characteristics while holding that drug testing implicates the fourth amendment. *Von Raab*, 816 F.2d at 176; *AFGE*, 651 F.Supp. at 733.

■■■ The City also argues that "Plaintiffs' contention [that drug testing by urinalysis is a search within the fourth amendment] would lead to the absurd result that a public employer would require some ground to suspect that a prospective employee was unfit before it could require him to subject himself to a physical examination." Brief in Opposition to Plaintiffs' Motion for Partial Summary Judgment ("the City's opposition brief"), at 8. It continues, "One searches in vain for any fourth amendment or other jurisprudential basis for distinguishing between furnishing urine samples as part of such physical examinations and furnishing them in connection with the drug testing...." *Id.* at 9 n. 4. This argument is faulty in two respects. First, the City merges the threshold inquiry of whether urinalysis is a search with the secondary issue of whether such a search is reasonable. Obviously, different employer justifications and employee expectations of privacy are involved in physical examinations and drug tests, and the undisputed proposition that a governmental employer can require urinalysis as part of a routine physical examination does not necessarily mean that urinalysis is not a "search." Second, the City ignores a necessary consequence of its argument. In *Schmerber*, the Court held that the taking of blood to seek evidence of intoxication was a fourth amendment search; it is doubtful that the City is willing to concede that it is therefore precluded from performing blood tests as a component of physical examinations of its employees. This Court concludes that the absence of constitutional problems with physical examinations does not require the result that the City urges. *See Lovvorn*, 647 F.Supp. at 881 n. 7; *Caruso*, 133 Misc.2d at 555, 506 N.Y.S.2d at 798.

B. *Drug Testing by Urinalysis is an Unreasonable Search Unless Individualized Reasonable Suspicion Exists to Believe that Further Evidence of Drug Use will be Revealed*

In *O'Connor*, Justice Scalia apparently agrees with the plurality's analysis of "reasonableness" of a search of public employees, according the plurality's opinion on this issue the weight of a decision of the Court. To determine the standard of reasonableness, the Court states, "In the case of searches conducted by a public employer, we must balance the invasion of the employees' legitimate expectations of privacy against the government's need for supervision, control and the efficient operation of the workplace." 107 S.Ct. at 1499. Analyzing the "realities of the workplace" and the disruption of routine business, the plurality decided that a warrant requirement for workplace searches not involving criminal investigations would be unduly burdensome. *Id.* at 1500–01. Next, the Court determined whether probable cause is the appropriate standard for employer searches, weighing the public and private interests. On one side of this balance are the government interests in efficient and effective operation of the workplace, tangible damage to the proper operation of the workplace by delays incurred while warrants are sought, and the burden of teaching supervisors the probable cause standard; on the other is "the relatively limited invasion" of employee privacy, which can be further reduced by keeping personal belongings at home. *Id.* at 1501–02. Finding that this balance favors the employer, the Court held that the probable cause standard would be impractical, and that "public employer intrusions on the constitutionally protected privacy interests of government employees for noninvestigatory, work-related purposes, as well as for investigations of work-related misconduct, should be judged by the standard of reasonableness under all the circumstances." *Id.* at 1502. Such searches must be reasonable both at their inception and in their scope to pass constitutional muster. Although the Court states that a search is ordinarily "justified at its inception" when there are reasonable grounds for expecting that it will expose evidence of employment-related misconduct, the Court declined to determine whether "individualized suspicion" is an essential element of its standard of reasonableness. *Id.* at 1503. A search is "permissible in scope" when it is reasonably related to its objectives and not excessively intrusive in comparison to the alleged misconduct. *Id.*

*O'Connor*'s standard of reasonableness for employer searches, finally articulated as "reasonableness under the circumstances," is a curious concept indeed. The Court offers little guidance about how this concept shall be given content. *See id.* at 1514 n. 14 (Blackmun, dissenting). Apparently, the public and private interests which are weighed to consider whether a standard of less than the traditional probable cause is indicated will again be considered. *See NFFE*, at 942. Otherwise, it is difficult to imagine how this Court would answer the question left open by the Supreme Court, *i.e.*, whether "individualized suspicion" is required to find that drug testing under the circumstances of this case was reasonable. The *O'Connor* court sidestepped this question; its resolution is central to the litigation before this Court.

Both the employer and employee interests in drug testing by urinalysis are different in nature and weight from their interests in documents and private possessions kept in public offices. *O'Connor*'s concern with an employer's need for access to files and documents in order to effectively operate an office is not implicated here, since urinalysis is rarely an ordinary activity incident to a business. Instead, drug testing by urinalysis involves the other type of search discussed in *O'Connor* —an investigation of employee malfeasance. Nevertheless, the City must demonstrate a nexus between its need for drug testing and work-related misconduct which adversely affects its operations as an employer of police officers. This showing can be made by two methods of factfinding: non-adjudicative factfinding of a compelling need on a national level for urinalysis of police officers, or adjudicative factfinding,

by evidence offered in this case, of a compelling need created by circumstances distinctive to this case. *Guiney*, 654 F.Supp. at 1300.

The City's briefs rely on two reasons for compelled drug testing by urinalysis of its recruits for the police department: (1) to preserve the integrity of the department; and (2) to assure that its officers will be fully able to perform their jobs. The City's emphasis is clearly on the former reason. Most courts which have considered drug testing of police officers have agreed that public confidence that law enforcement officers are themselves respectful of the law is critical to sustaining law enforcement's authority and legitimacy. *Von Raab*, 816 F.2d at 178; *Bostic*, 650 F.Supp. at 250; *Palm Bay*, 475 So.2d at 1324; *Fraternal Order of Police*, 524 A.2d at 437; *Caruso*, 133 Misc.2d at 552, 506 N.Y.S.2d at 795. An officer who uses illegal drugs may be susceptible to bribery, or to a temptation to divert seized drugs, if he or she is called upon to participate in drug-related arrests. *Von Raab*, 816 F.2d at 178. Courts have also recognized that drug use may affect an officer's ability to perform his or her job at an optimal level. *Von Raab*, 816 F.2d at 178; *Bostic*, 650 F.Supp. at 250; *Turner*, 500 A.2d at 1008; *Palm Bay*, 475 So.2d at 1324. However, "[i]n weighing the need against the private intrusion, the courts are persuaded by the absence of a factual showing that drug use is widespread among the affected employees or that it presents an identifiable risk to the public." *Fraternal Order of Police*, 524 A.2d at 436, and cases cited therein. The City's briefs have not attempted to indicate that such findings of fact are appropriate in this case, and it appears that the evidence would not permit a finding of compelling need based upon circumstances unique to the Cleveland Police Department or this particular class of cadets. *See Guiney*, 654 F.Supp. at 1300, and cases cited therein.

The intrusiveness of urinalysis for drug testing must be weighed against these interests. As discussed above, the interest in privacy implicated by urinalysis drug testing is at the heart of the values protected by the fourth amendment, since urinalysis seeks to uncover physiological information and to learn of activities conducted outside the public sphere. Such an intrusion violates the sanctity of personal choices, thoughts, and decisions, which are central to individual liberty. *See AFGE*, 651 F.Supp. at 732; *Capua*, 643 F.Supp. at 1511, 1515. While this Court ascribes to the universally recognized proposition that by accepting government employment, public employees' legitimate expectations of privacy are somewhat less than that of their private sector counterparts, it also recognizes that the nature of the intrusion in this case is different from the intrusion in *O'Connor*. In this case, public employees cannot avoid exposure of their private information by keeping evidence of it at home. Obviously, "physiological secrets" travel with a person. By the nature of the search and the information sought, then, urinalysis is a much greater invasion of privacy than a search of an employee's office.

Moreover, the act of urination is primarily done with utmost privacy, increasing the intrusiveness of urinalysis. Unlike the taking of blood, passing urine is generally associated with humiliation and embarrassment if it must be conducted in the presence of another. *E.g. Lovvorn*, 647 F.Supp. at 880; *Capua*, 643 F.Supp. at 1514; *Caruso*, 133 Misc.2d at 548, 506 N.Y.S.2d at 793. The City asks this Court to take judicial notice that "there are places of public accommodation, including the Cleveland Stadium, which maintain public toilets for male persons in which acts of urination are performed into an open trough, in full view of numerous strangers of the same sex," and it requests that this Court not "elevate such idiosyncratic sensitivities [of persons avoiding such public toilets] to the norm." The City's opposition brief, at 20 n. 10. Not only is the fact of which the City asks this Court to take notice "legislative" rather than "adjudicative" and thus not governed by Fed.R.Evid. 201; it lacks materiality. Even though male persons sometimes use such public accommodations, women seldom, if ever,

do. The privateness of the act of urination is best described in *Von Raab:*

> There are few activities in our society more personal or private than the passing of urine. Most people describe it by euphemisms if they talk about it at all. It is a function traditionally performed without public observation; indeed, its performance in public is generally prohibited by law as well as social custom. While individuals may choose not to urinate in private but instead to use public toilet facilities, they make this choice themselves. Moreover, expectations of privacy in a particular activity do not exist on an all-or-nothing basis.... [E]ven the individual who willingly urinates in the presence of another does not " 'reasonably expect to discharge urine under circumstances making ... discover[y of] the personal physiological secrets it holds' " possible.

816 F.2d at 175 (footnotes omitted). Thus, this Court must conclude that urinalysis is particularly intrusive for many people, and certainly quite incomparable to permitting a supervisor to shuffle through papers on a desk.

A comparison of these employer and employee interests reveals that a balance is much more difficult to achieve in this case than in the search of a public employee's office and papers. Naturally, this Court agrees that protecting the integrity and the implied authority of police as law enforcement officers is an important government interest and supports the permissibility of urinalysis. However, the City's reliance on this interest is stated with undeserved hyperbole. Although drug use is currently perceived as a problem of national proportions, it is difficult to perceive why the possibility of drug use should undermine public confidence in law enforcement any more than any number of possible illegalities by police officers would undermine public confidence. Yet it is not suggested that police officers' homes could be systematically searched for signs of other possible illegalities in order to sustain public confidence. Moreover, the interest in job performance is much stronger when there is actual evidence that job performance has suffered. When the severely intrusive nature of urinalysis is added to this calculation, it is obvious that a reasonable individualized suspicion that a police officer is using illicit drugs must be required for urinalysis to be reasonable under all the circumstances.

Another court within this circuit has explained how the requirement of reasonable individualized suspicion accommodates both the important governmental interests and the employees' constitutional rights:

> The City need not rely on mass drug testing to detect drug usage by members of the Chattanooga Fire Department. If indeed the use of drugs is causing deficient performance on the part of fire fighters, this should be detectable to a considerable extent by properly designed personnel procedures to detect such drug abuse symptoms as absenteeism, aberrant conduct and financial difficulties.

*Lovvorn,* 647 F.Supp. at 883. Judge Edgar found this analysis equally applicable to across-the-board testing of police officers:

> Information concerning drug problems can be acquired by physical observation of police officers, citizen complaints, tips from other law enforcement agencies and other means.... [T]his does not mean that the Chattanooga Police Department may not administer urine tests to its police officers for the presence of illegal drugs. This decision does mean that if such tests are given, they must be given on reasonable suspicion, their scope must be related to their objective, and they must not be excessively intrusive.

*Penny v. Kennedy,* 648 F.Supp. 815, 817 (E.D.Tenn.1986). Judge Edgar's recognition that observational evidence can be used to fulfill the reasonable suspicion standard with respect to police officers is especially astute. Police officers deal closely with each other on a sustained basis and can be expected to pay attention to any symptoms of drug abuse in their colleagues, since their lives depend on their colleagues' performances. Moreover, *O'Connor*'s concern about the burdens and difficulties of teaching supervisory per-

sonnel concepts such as "reasonable suspicion" is inapposite in the case of police officers, since they work with the intricacies of such concepts daily.

The overwhelming majority of cases challenging urinalysis has concluded with decisions either that testing is unconstitutional in the absence of individualized suspicion, or that testing was proper because individualized suspicion was present. In fact, with only one exception, every court considering the validity of the testing of police officers has found an individualized suspicion requirement. *AFGE*, 651 F.Supp. at 735, 738 (civilian law enforcement officers employed by the Army cannot be tested in the absence of reasonable suspicion if their duties are those of ordinary police officers); *Capua*, 643 F.Supp. at 1517; *Bostic*, 650 F.Supp. at 250; *Turner*, 500 A.2d at 1008–09 (upholding police policy permitting testing based upon reasonable individualized suspicion of drug use); *Palm Bay*, 475 So.2d at 1325; *Caruso*, 133 Misc.2d at 557, 506 N.Y.S.2d at 798–99 (reasonable suspicion standard is proper for testing of members of the New York Police Department's Organized Crime Control Bureau). As *AFGE* suggests by distinguishing between "ordinary" police employed by the Army and police with special military functions, it appears that the government must have interests in addition to those articulated by the City in order to alter the balance of interests so that individualized suspicion is not necessary. *See also Fraternal Order of Police*, 524 A.2d at 437 (indicating that "public confidence" interest alone does not outweigh officers' privacy interests).

Because of a perception that the virtual unanimity of federal district courts and state courts in requiring individualized suspicion has been destroyed by recent decisions of federal appellate courts, *see* Noble, *Tests for Drugs Win More Backing*, N.Y. Times, May 18, 1987, at 1, col. 1 (national ed.), it is necessary to analyze each of these decisions individually. In *McDonell v. Hunter*, 809 F.2d at 1302, the Eighth Circuit reviewed the constitutionality of a policy subjecting Department of Corrections employees to numerous searches of their vehicles and persons, including urinalysis. The court conducted the balancing test with an eye toward the threat posed to prison security by drug-using corrections officers who had consistent contact with inmates, and it concluded:

> Because the institutional interest in prison security is a central one, because urinalyses are not nearly so intrusive as body searches, *Shoemaker v. Handel*, 608 F.Supp. 1151, 1158 (D.C.N.J.1985), aff'd, 795 F.2d 1136 (3d Cir.1986), and because this limited intrusion into the guards' expectation of privacy is, we believe, one which society will accept as reasonable, we modify the district court's order and hold that urinalyses may be performed uniformly or by systematic random selection of those employees who have regular contact with the prisoners on a day-to-day basis in medium or maximum security prisons. Selection must not be arbitrary or discriminatory.

*Id.* at 1308. The narrowness of this holding is apparent from its very terms, but is underscored by the court's unwillingness to extend across-the-board testing to other prison employees not falling within this select group:

> Urinalysis testing within the institution's confines, other than uniformly or by systematic random selection of those employees so designated, may be made only on the basis of a reasonable suspicion, based on specific objective facts and reasonable inferences drawn from those facts in light of experience that the employee is then under the influence of drugs or alcohol or that the employee has used a controlled substance within the twenty-four hour period prior to the required test.

*Id.* The extrahazardous nature of prison security, then, appears to tip the balance toward the employer so that, in the Eighth Circuit, individualized suspicion is not necessary when this additional governmental interest is present.[2] *See also Allen*, 601

---

2. A lesser expectation of privacy in the penological environment also permits drug testing without individualized suspicion of prisoners, *Spence*, 807 F.2d at 755, and *Storms*, 600

F.Supp. at 491 (permitting random urinalysis to determine whether drugs affected ability of employees to work with high voltage wires). Perhaps it is such an additional interest which dictated the Seventh Circuit's finding that bus driver rules requiring drug testing after "any serious accident," or on reasonable suspicion, were constitutional. *Division 241 Amalgamated Transit Union v. Suscy*, 538 F.2d 1264, 1267 (7th Cir.) (per curiam), *cert. denied*, 429 U.S. 1029, 97 S.Ct. 653, 50 L.Ed.2d 632 (1976). While the *Suscy* court acknowledged its duty to balance individual and public interests, its performance of this balance is cryptic, at best. This Court can accept the *Suscy* rationale to the extent that it depends upon the additional employer factor of investigating an accident.

In *Shoemaker*, 795 F.2d at 1136, the Third Circuit upheld New Jersey Racing Commission regulations requiring random urine testing of jockeys without individualized suspicion. Based upon the traditional intense regulation of the horse racing industry, the court held that the administrative search exception to the fourth amendment which has been applied in closely regulated industries was applicable. This exception was justified because of the strong state interest in conducting such a search (the public perception of integrity in the racing industry), and the reduced expectation of privacy by jockeys because of the pervasive regulation of the industry. *Id.* at 1142. In reaching its conclusion that urinalysis was justified at its inception, the court emphasized that its holding applied only to urinalysis of *voluntary* participants in a highly regulated industry. *Id.* at 1142 n. 5.

Since the *Shoemaker* decision was rendered, almost every governmental entity forced to defend a drug test has urged that it is controlling. Only one court has agreed with this assertion. *Rushton*, 653 F.Supp. at 1525 (upholding "fitness for duty" program at a nuclear facility). Even the *Capua* court, which is within the Third Circuit, ruled that *Shoemaker* must be distinguished from cases involving a broad drug testing program of firefighters and police officers. The reasons that *Shoemaker's* rationale is inapplicable to cases such as the one *sub judice* are succinctly set forth in *Fraternal Order of Police:*

Police officers are not members of a "highly regulated industry." Like many other groups of public employees, police officers are subject to a variety of statutory and administrative controls. But government's supervision of its employees cannot be equated with the regulation of sensitive industries requiring "close supervision and inspection." Police are not engaged in a "commercial enterprise"; they are not subject to a "comprehensive and defined" regulatory scheme in which drug testing is a "necessary component"; there has been no legislative determination "that warrantless searches are necessary to further a regulatory scheme[.]" To treat the police as a "pervasively regulated industry" would dangerously extend and distort that exception to the warrant requirement beyond its intended scope. We thus find ourselves in agreement with the many courts which have found *Shoemaker* inapplicable to or distinguishable from cases involving public employees. *See, e.g., [AFGE]*, 651 F.Supp. 726, 734–35 (S.D.Ga.1986); *Caruso*, 506 N.Y.S.2d at 798.

524 A.2d at 434–35 (citations and footnotes omitted).

Two other cases reaching federal appellate courts did not result in decisions on whether drug testing in the absence of reasonable individualized suspicion is permissible. In *Mack v. United States*, 814 F.2d 120 (2d Cir.1987), the court affirmed the trial court's entry of summary judgment against the plaintiff, a former agent of the Federal Bureau of Investigation who was discharged for cocaine use and making false statements after urinalysis was conducted. However, the appellate court affirmed the district court on the basis that

F.Supp. at 1220, and probationers. *Williams,* 787 F.2d at 1186 n. 9; *Macias,* 649 S.W.2d at 152. *But see Tucker,* 613 F.Supp. at 1129 (urinalysis of prisoners without individualized suspicion is unconstitutional if not for purpose of prison security).

the plaintiff had consented to urinalysis, and it indicated that the district court should not have unnecessarily reached the difficult fourth amendment issues. *Id.* at 124–25. In *NFFE,* the Court of Appeals for the District of Columbia Circuit reversed the trial court's determination that it had no subject matter jurisdiction to consider constitutional challenges to the program also at issue in *AFGE.* It remanded the case to the district court to determine the reasonableness of the search. At 941–42.

The only other pertinent decision is *Von Raab,* where the Fifth Circuit upheld a testing program for some Customs Bureau transfers into "sensitive positions" without a requirement of reasonable individualized suspicion. Espousing a "totality of circumstances" approach, the court cited the following factors: limited scope and manner of the testing program; government justifications for testing; voluntariness of applying for a transfer requiring that the test be taken; the reduced expectation of privacy incident to government employment; the noncriminal nature of the investigation; analogy of drug interception to a regulated industry; lack of alternative information; and the effectiveness of testing. 816 F.2d at 176–80. The court stated, "Taking all of the relevant factors into account, we conclude that the Customs Service program for testing employees who seek a transfer to sensitive positions is not unreasonable." *Id.* at 180.

This Court finds that *Von Raab* is not persuasive with respect to this case. While this Court could take issue with the validity of several of the factors identified by the Fifth Circuit (such as the "voluntariness" and "regulated industry" factors), it finds a more serious flaw in the analysis. The *Von Raab* court does not even identify any employee interests, much less balance them against employer interests. It is not surprising, given that the court can identify only factors favoring testing, that it concludes that testing is constitutionally permissible as a reasonable search. However, even if the court's analysis were persuasive, this Court would find *Von Raab* distinguishable because of its consistent

references to the "sensitive" nature of these particular Customs Service positions. Once again, then, there is an additional factor weighing in favor of the reasonableness of testing without individualized suspicion, distinguishing these agents from ordinary police officers who have greater expectations of privacy. *But cf. Fraternal Order of Police,* 524 A.2d at 437–39 (reasonable suspicion requirement prohibits city policy to test police officers transferring to the narcotics bureau and every two years thereafter; based upon the New Jersey Constitution).

In sum, this Court's analysis of the circumstances leading to the urinalysis of Feliciano and Rojas persuades it that their drug testing was not reasonable in the absence of reasonable individualized suspicion. Application of the reasonable suspicion requirement in this case is dictated by precedent, as well as by this Court's independent assessment of the circumstances. The City admits that it had no individualized suspicion that Feliciano and Rojas used illegal drugs, as it must, based upon the evidence adduced to this Court in support of the summary judgment motions. Therefore, this Court holds that testing for drug use by a urinalysis of Feliciano and Rojas was not reasonable at its inception. Since the drug testing was an unreasonable search, this Court will not continue with an analysis of whether the testing was reasonable in its scope. However, it must evaluate the City's contention that even if the urinalysis was an unreasonable search, plaintiffs consented to the search and cannot claim that their fourth amendment rights were violated.

## C. *Plaintiffs did not Consent to Urinalysis*

The City proffers two arguments which it considers to implicate consent by plaintiffs. First, it argues that Feliciano and Rojas consented to urinalysis by seeking a job with the Cleveland Police Department, since public employment is voluntary. Second, it submits that plaintiffs actually consented to urinalysis. The first argument, which the City designated by the rubric

"implied consent," requires relatively little discussion.

### 1. *Implied Consent*

■ It is hornbook law that public employment cannot be conditioned upon waiver of constitutional rights, *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968), and several courts have held in the context of urinalysis that a public employer cannot force consent to an unreasonable search as a condition of employment. *E.g. NFFE*, at 943; *McDonell*, 809 F.2d at 1310. Since this Court has held that urinalysis is an unreasonable search in this case, it must also conclude that the City could not require urinalysis for drug testing as a condition of employment of these plaintiffs during their probationary period.

The City relies upon *Wyman v. James*, 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971) in support of its implied consent argument. *Wyman* involved a constitutional challenge to mandatory home visits by caseworkers to recipients of Aid to Families with Dependent Children. The Court held that "we are not concerned here with any search by the New York social service agency in the Fourth Amendment meaning of that term." *Id.* at 317, 91 S.Ct. at 386. It relied upon the home visit requirement in the statute and regulations; the rehabilitative and investigative (although non-criminal) nature of the visit; and the argument that the visit was not forced or compelled, since the aid would merely cease if entry was refused. *Id.* Although *Wyman* supports the City's claim, it is simply irreconcilable with *Pickering* and its progeny. Many courts have distinguished *Wyman* as inapplicable; perhaps the most reasonable way to understand it is as limited to its factual situation. *See Zweibon v. Mitchell*, 516 F.2d 594, 633 n. 94 (D.C.Cir.1975), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 187 (1976). This Court is unaware of any decision relying upon *Wyman* in the drug testing context, and it refuses to do so.

The City also argues that its implied consent theory is supported by a balance of employee and employer interests under *Pickering*. Such a balancing has been performed in this Court's discussion of whether urinalysis is an unreasonable search. Indeed, the implied consent argument is another way of interjecting employer interests which argue for limiting the scope of the fourth amendment in the context of drug testing of public employees. That issue has already been resolved and need not be reconsidered under the rubric of "consent."

### 2. *Actual Consent*

The City also relies upon plaintiffs' deposition testimony to argue that even if the fourth amendment would otherwise be violated, plaintiffs consented to urinalysis. Plaintiffs respond that any "consent" was not "voluntary."

■ The Supreme Court probed the concept of the voluntariness of consent to a search in *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). It noted that "voluntariness" could not be defined literally, or as "but-for" causation, but should be understood as "an accommodation of the complex of values implicated in police [investigations]." *Id.* at 224, 93 S.Ct. at 2046. The Court held:

> [W]hen the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent.

*Id.* at 248–49, 93 S.Ct. at 2059 (footnote omitted). Factors to be evaluated include the youth of a suspect, lack of education, low intelligence, lack of legal advice about constitutional rights, the length and prolonged nature of an investigative encounter, and the use of physical punishment.

*Id.* at 226, 93 S.Ct. at 2047. Threats perceived by an accused because of social discrepancies such as race or sex are also relevant, and the knowledge of the right to refuse consent is highly relevant, although not controlling. *United States v. Mendenhall,* 446 U.S. 544, 558–59, 100 S.Ct. 1870, 1879–80, 64 L.Ed.2d 497 (1980).

In an action under 42 U.S.C. § 1983 (1982) for a fourth amendment violation, defendants bear the burden of demonstrating plaintiffs' voluntary relinquishment of their constitutional rights, in the face of a presumption against such a waiver. *Tarter v. Raybuck,* 742 F.2d 977, 980 (6th Cir.1984), *cert. denied,* 470 U.S. 1051, 105 S.Ct. 1749, 84 L.Ed.2d 814 (1985). Voluntariness is an issue of fact, to be decided by the Court. *United States v. Scott,* 578 F.2d 1186, 1189 (6th Cir.), *cert. denied,* 439 U.S. 870, 99 S.Ct. 201, 58 L.Ed.2d 182 (1978). Consent must be proved by clear and positive testimony, and it must be unequivocal, specific, and intelligently given, uncontaminated by any duress and coercion. *United States v. Williams,* 754 F.2d 672, 674 (6th Cir.1985).

In its argument that Feliciano and Rojas actually consented to urinalysis, the City relies totally on the following deposition testimony:

Q Now, if it had been announced in advance, either in the room that you were in or when you first came into the restroom, that the purpose of checking the sample was to test it for the presence of illegal drugs, or other illegal substances, would you have been reluctant or unwilling to voluntarily produce the sample?

A I don't think we had a choice.

MR. BERGER: Would you please read the question again.

(Question read.)

A No.

\* \* \* \* \* \*

Q Was it true that you were willing to take a polygraph test and a blood test?

A That's correct.

Q Were you willing to do that throughout the time that you were at the Academy as a police trainee?

A Yes, I was.

Q Were you also willing to take urine testing during that entire time as well?

A Yes, I was.

Feliciano dep., at 26, 34.

Q At the time that you produced the sample of urine, did you have any reason, whatsoever, to believe that there would be any evidence of marijuana use, or the use of any other illegal substance, in your urine?

A No, because—well, I had a prescription. Other than that, no.

Q Did you have any reason to believe that there would be any evidence of marijuana use in your urine at the time you produced the sample?

A No.

Q Now, if you had been told, prior to giving the sample, that the purpose of testing it was to find if there was any evidence of the use of marijuana or any other illegal substance in your urine, would you have refused to give the sample?

A No.

\* \* \* \* \* \*

Q Now, Mr. Rojas, did you indicate at the Civil Service Commission hearing that you were prepared to take polygraph and blood tests?

A Yes, I did.

Q Was that true?

A Yes, it was.

Q Were you willing to do that throughout the time you were at the Academy as a police trainee?

A Yes, I was.

Q And was the same true for urine testing, that you were willing to undergo that throughout the time that you were at the Academy for police training?

A Yes.

Rojas dep., at 18–19, 23–24.

Both plaintiffs qualify their deposition testimony by affidavits further explaining their answers. Feliciano's affidavit indicates that he believed that his employment would be terminated if he did not produce a

urine sample; that he would not have submitted it if he had known that drug testing is unreliable or that compulsory urinalysis of government employees is unconstitutional; and that he responded to the question about urine testing with the understanding that it implied that he would not be discharged based on its results. He also averred that the instructors were wearing guns when they administered the test, which was unusual. Rojas' affidavit is substantially similar.

On this evidence, this Court must find that plaintiffs' fourth amendment rights were not knowingly and freely waived. Regardless of any coercion implied by an environment where the supervising officers were carrying weapons, plaintiffs clearly indicate that they believed that producing the urine sample was necessary to retain their jobs. Just as importantly, plaintiffs could not be expected to know that they were waiving constitutional rights, given the developing fourth amendment jurisprudence with respect to drug testing. Notably, the individual defendants have been granted qualified immunity because they could not know that their actions were unconstitutional; it is astounding that the City submits that plaintiffs could voluntarily waive rights which were unknown to its own supervisory personnel. Finally, plaintiffs' post-deposition explanations of their testimony are entirely credible when the specific questions relied upon by the City are read in the context of the parallel questions about polygraph and blood tests.

The only plaintiffs' responses upon which the City relies are not the sort of "clear and positive" testimony which a defendant must adduce to meet its burden on consent, and thus overcome the presumption against waiver. If the City really believed that consent to the drug tests were unqualified, it would have been simple to ask a few additional questions of the deponents to establish the waiver and assure that its burden was amply satisfied. Instead, the City offers only these few answers to leading questions and maintains that its burden has been met, despite all of plaintiffs' evidence negating voluntariness. This Court must hold that the City has failed to prove that plaintiffs' production of urine samples was voluntary under all of the circumstances. *See also AFGE*, 651 F.Supp. at 736; *Bostic*, 650 F.Supp. at 249.

In its attempt to pin plaintiffs down to their unqualified deposition answers, the City relies on *Mack*, 814 F.2d at 124, where the Second Circuit held that the evidence showed that the plaintiff had unequivocally consented to urinalysis. It summarized this evidence:

The waiver form signed by appellant provided that:

I have been advised that I am under no obligation to provide a urine sample in connection with this administrative inquiry and I have further been advised that any information I supply would not be used against me in any criminal proceeding. Therefore I voluntarily submit to providing a urine specimen....

At his deposition appellant was asked if the government forced him to provide a urine sample. He replied:

No. I was totally cooperative at that point and happy to provide any information they wanted.

*Id.* When the plaintiff answered a summary judgment motion with an affidavit indicating that he submitted to the test because of fear of losing his job and coercion, the court held that this affidavit contradicted his deposition testimony and should be disregarded, and that summary judgment should be granted against him on his fourth amendment claim because of consent. *Id.* at 124–25.

It is also the rule of the Sixth Circuit that "[a] party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony." *Reid v. Sears, Roebuck and Co.*, 790 F.2d 453, 460 (6th Cir.1986) (citing *Biechele v. Cedar Point, Inc.*, 747 F.2d 209, 215 (6th Cir.1984)). However, affidavits may sufficiently contradict deposition testimony to preclude their use. *See Bender v. Southland Corp.*, 749 F.2d 1205, 1211 (6th

Cir.1984). In this case, plaintiffs' affidavits qualify and explain their depositions, rather than contradict them. Moreover, the evidence of consent is entirely distinguishable from that in *Mack*. The quality of plaintiffs' responses were unlike *Mack*'s expositive answer to his deposition question, and Feliciano and Rojas neither signed a waiver form nor were advised that they were not required to give a sample. Because *Mack* is inapposite to this case, this Court must find for Feliciano and Rojas on the issue of consent.

V. CONCLUSION

As this Court has indicated, there is without doubt a perception that the use of illegal drugs is an important problem which affects our national well-being. Indeed, drug use by police officers is especially undesirable, since we rely upon these authorized representatives to enforce our drug laws. However, the warning of Chief Judge Lay of the Eighth Circuit should be heeded:

> The fundamental principles surrounding the fourth amendment still serve us well. Only with the greatest caution should we whittle away basic constitutional rights, for we often come to regret the unfortunate rulings we have made in times of hysteria in the past. *Compare, e.g., Korematsu v. United States*, 323 U.S. 214, 217–19, 65 S.Ct. 193, 194–95, 89 L.Ed. 194 (1944) (exclusion from areas of the west coast during World War II of all persons of Japanese ancestry held constitutional on grounds of military necessity) and *Hirabayashi v. United States*, 320 U.S. 81, 101, 63 S.Ct. 1375, 1386, 87 L.Ed. 1774 (1943) (finding curfew regulations imposed against citizens of Japanese ancestry not unconstitutionally discriminatory), *with Hohri v. United States*, 782 F.2d 227, 231–39 (D.C. Cir.), *cert. granted*, — U.S. —, 107 S.Ct. 454, 93 L.Ed.2d 401 (1986) (in treating statute of limitations issues raised by money damages claims filed by Japanese-American World War II internees or their representatives, court discusses history of litigation surrounding their internment and notes that the "military necessity" grounds to which the Supreme Court deferred in *Hirabayashi* and *Korematsu* were found by a subsequent congressional commission to be without factual foundation).

*McDonell*, 809 F.2d at 1310–11 (Lay, concurring in part and dissenting in part). This Court is convinced that the reasonable individualized suspicion standard protects Feliciano and Rojas' fourth amendment rights without significantly impairing the City's ability to remove drug abusers from its ranks.

Plaintiffs' motion for partial summary judgment is granted against the City. Summary judgment is granted to the individual defendants on the fourth amendment claims against them. The City's motion for summary judgment on the merits of the fourth amendment claims is denied. A status call will be held on June 30, 1987 at 4:00 p.m. to set forth further proceedings in this litigation.

IT IS SO ORDERED.